The Pittsburgh, Cincinnati and St. Louis R. W. Co. *v.* Morton et al.

61 539
141 275

BILL OF EXCEPTIONS.—*Evidence.*—*Supreme Court.*—The fact that, in a bill of exceptions which purports to contain all the evidence given on the trial of a cause, an answer given by a witness is apparently incomplete and unfinished, does not show that any of such evidence has been omitted.

The Pittsburgh, Cincinnati and St. Louis R. W. Co. *v.* Morton *et al.*

COMMON CARRIER. — *Railroad.*— *Refusal to Transport Freight.*— *Tort.*—*Contract.*—In an action against a railroad company, by a shipper of grain, the complaint alleged that the defendant, while operating a certain line of railroad running from a certain place, through the plaintiff's place of business, to another point, publicly held herself out as a common carrier for hire along such railroad; that it was the duty of the defendant to provide the usual and necessary means for transporting grain along such line, from plaintiff's place of business, which was a station on such railroad; that the plaintiff, at a certain time, had purchased a certain quantity of grain for shipment on defendant's railroad, but that the defendant, though often requested so to do, failed to furnish the means necessary for transportation, and refused to receive and transport such grain.

*Held*, on demurrer, that the complaint states a cause of action arising *ex delicto*, and not *ex contractu.*

SAME.—*Implied Obligation.—Connecting Lines.*—The implied obligation of a common carrier, arising from his relation to the public, is limited by the termini of its own route; and the fact that it has connections with other routes, extending beyond its own termini, which it does not operate, control or own, does not, in the absence of a special contract so to do, make it liable as a common carrier for a failure to carry, or furnish means to carry, merchandise over such other routes.

SAME.—*Means of Transportation.*—Such common carrier is not bound by his general public obligation to provide other means of transportation than such as it owns, uses or holds out to the public on its own route for that purpose.

SAME.—*Damages.—Evidence.*—In an action against a common carrier for damages in refusing to receive and transport grain properly stored for transportation, it is competent for the plaintiff to give evidence showing that, because of such refusal, his grain became heated and spoiled, notwithstanding the fact that such damage resulted from something inherent in the nature of the grain itself.

SUPREME COURT.—*Weight or Want of Evidence.*—Where, from the record, evidence is lacking on some point necessary to support the judgment rendered, such judgment will be reversed by the Supreme Court, notwithstanding the fact that the other material points are fully sustained by the evidence.

Dissenting opinion by WORDEN, J.

From the Tippecanoe Circuit Court.

*E. Walker, B. W. Langdon, J. A. Stein* and *N. O. Ross*, for appellant.

*J. R. Coffroth, T. A. Stuart, R. P. DeHart* and *D. V. Burns*, for appellees.

BIDDLE, C. J.—This suit was originally brought in the Newton Circuit Court, by the appellees, against the appellant and "The Columbus, Chicago and Indiana Central Railway Company."

The complaint, besides the usual formal averments, states the following substantial facts:

That the plaintiffs were, at the time of the grievances complained of, engaged in buying, shipping and selling all kinds of grain, under the firm name and style of R. Morton & Co., at Kentland, in Newton county, State of Indiana; that the defendants, at the same time, "were operators of, and as common carriers for hire were engaged in transporting for hire all articles of merchandise along, a certain line or lines of railway, extending from the city of Chicago, in the State of Illinois, to the city of Columbus, in the State of Ohio, and there connecting with the Pennsylvania Railroad Company, thus forming a continuous line of transit from said city of Chicago to the city of Philadelphia, in the State of Pennsylvania, and the city of New York, in the State of New York; and so represented and held themselves out to the public generally as common carriers for hire of personal property, such as merchandise and all kinds of grain, from the said town of Kentland to the said cities of Philadelphia and New York; that one of the branch or division lines, operated by said defendants as aforesaid, now passes, and at the time of the commission of the grievances as hereinafter complained of did pass, through the said town of Kentland, in the county of Newton, and State of Indiana;" that it was the duty of the defendants, as such common carriers, to furnish cars, ship grain, etc., along their line or lines of railroad, when requested to do so, for hire; that the plaintiffs relying upon their right to have such grain as they might wish transported over and along said lines of railway, they purchased, in the month of December, 1870, eight thousand bushels of corn, and stored the same at Kentland for shipping, "and

then and there demanded of said defendant means of transportation, and that they would transport said grain to the city of New York aforesaid, or to the terminus of their said route, in the same general direction, they, the said plaintiffs, being then and there ready, willing and able to pay the said defendants the usual and customary rates of freight charged by them for the transportation of such grain; but the said defendants, wholly disregarding their duties and obligations, failed and refused to transport said grain, or any part thereof."

There are other separate averments in the complaint, called paragraphs, numbered 2, 3, 4, 5, 6, 7, 8 and 9, but they do not contain separate causes of action; they are rather specified breaches, at different times, of the obligation of the defendants as such alleged common carriers, and averments of special damages sustained.

On the application of the defendants below, the venue was changed to the Tippecanoe Circuit Court, wherein the appellants filed a demurrer to the complaint, alleging as ground the insufficiency of the facts stated therein to constitute a cause of action. The demurrer was overruled, and exceptions reserved; whereupon the appellants answered by a general denial.

The appellees then dismissed the case as to "The Columbus, Chicago and Indiana Central Railway Company."

A jury trial was had, resulting in a verdict for the appellees. Motion for a new trial; causes filed; motion overruled; exceptions; judgment on the verdict; appeal.

The demurrer to the complaint was properly overruled. We think it is sufficient. The objections made to it by the appellant are not substantial.

The appellees call our attention to what they urge as a defect in the record, namely: That, although the bill of exceptions purports to contain all the evidence given in the case, yet it appears upon its face that it does not, and they point out several objections to it to sustain their views, as follows:

In the cross-examination of Richard Morton, one of the appellees, as a witness, he was asked the question:

" Can you tell the number of cars you received from the company during any one month ? "

He answered:

" No, not accurately. I can approximate it. I received in the neighborhood of ———."

There is another instance in the testimony of the same witness, touching the elevators, wherein his answer to a question seems to be unfinished, in a similar manner; but it is impossible for us to tell by the record, whether, at these times, the witness answered any farther than the evidence in the record states, or not. It may be that that was all he said at these several times; if so, the record is right. These instances are not similar to those where something has been introduced as evidence, as the contents of a paper, which does not appear in the bill of exceptions. In such cases, the bill of exceptions, notwithstanding it states that it contains all the evidence, shows upon its face that it does not. In this case the general statement, that the bill contains all the evidence, is not contradicted by what appears to be an unfinished answer of a witness to a question, because the answer might, in fact, have remained unfinished, precisely as it is stated in the bill of exceptions.

The substantial evidence given in the case is as follows: On behalf of the appellee,

B. M. Chaffee testified: " Am agent of the I. B. & W. Railway, at Danville, Illinois. In 1870 was agent of Pittsburgh, Cincinnati and St. Louis Railway Company, at Kentland, Indiana. Was such agent from 1868, until November 7th, 1871. Mr. Ritchie was my successor. No other railroad passed through Kentland during that period. I know plaintiffs."

Admitted that plaintiffs had in storage at Kentland, in December, 1870, eight thousand bushels of corn, and that

this was not an unusual or unreasonable amount for shipment at that period of the year.

"Back as far as December, 1870, and in the Fall of 1871, Mr. Morton used to request transportation nearly every morning, sometimes verbally and sometimes by written notices. Not during the whole time, but during the Fall, there was a constant demand for cars. I used to send these written demands to Mr. Hill, superintendent, at Logansport. I think Mr. Morton sent a man east to obtain White Line cars to transport grain in. I think cars were not furnished as fast as he ordered them."

Admitted by defendant's counsel, that, if defendant had sent a train to Kentland, plaintiffs would have loaded it without delay.

"Sometimes he would demand five cars, and sometimes ten cars, a day, I think. There were not enough cars to supply the demand that he made. He demanded cars principally for Boston and New York. What he had been shipping in 1870, and such transportation as was furnished in 1871, was shipped to Logansport, as a general thing. I used to give bills of lading for New York and Boston.

"There were other dealers in grain and shippers, at that station. I couldn't give any particular month in which Mr. Morton made demands for cars. I have no means of fixing the dates of the several demands. He did not do different from other shippers. He used to tell me where he wanted it to go. Demands were made to me for cars by other shippers during this time; by three other firms. There was no discrimination made in shippers. Mr. Morton had his full share of cars. I only know from information of his going for White Line cars. White Line cars neither belonged to, nor were they controlled by, the Pittsburgh, Cincinnati and St. Louis Company. A certain amount was distributed by the company. For instance, the agent at Union City would give this company twenty-

five cars, and then the master of transportation would distribute them where he thought they were most needed.

"This White Line was a line of cars between these points west and New York and Boston, not controlled by this company. Morton's usual demand was for White Line cars. . He gave no reason for his demand of these cars. There was no demand made for our own cars that we could not fill, during the time I was agent. All orders for such cars were filled by me.

"White Line cars ran over the defendant's road. Mr. Morton used to say he wanted White Line cars; he, at the same time, said he would take any thing that would go through. He demanded transportation through to New York. I think they used to load National and Union Line cars there, sometimes, for New York. No other kind that I remember of. Never loaded Pittsburgh, Cincinnati and St. Louis local cars with freight to be shipped to New York. A transfer of such was made at Pittsburgh, I think, by the companies. The defendant refused to furnish White Line cars, because they did not have them to give.

"I always gave plaintiffs a fair share of cars, when I had them. He did not want defendant's cars, because they would not go though to Boston or New York without transfer. Cars of defendant did not run east of Pittsburgh, Pennsylvania, either for passengers or freight. The National and Union Line cars were not the property of the defendant company. These fast freight lines are independent of the railroad companies.

"I mean by transfer, taking the grain from the company's cars and putting it in line cars. Grain from our cars could be transferred into Pennsylvania Railroad Company's cars at Pittsburgh, and thence shipped to Philadelphia or New York, and, going to Boston, another transfer at New York. Line cars are not always furnished railroad companies on demand, but are distributed

by the officers of the transportation companies to the different railroad companies. Railroad companies can not get these through line cars whenever they demand them. They are distributed by the officers of each line. These lines of cars run over defendant's road and connections, whenever they do get them."

James Burton: " Know plaintiffs. I was working for plaintiffs at Kentland, Indiana, in their warehouse, in 1871 and early part of 1872. It was a grain elevator. I left them the last of August, 1872. Was with them about two years. I did not keep the grain accounts. The elevator was completed sometime in 1871. Plaintiffs stored in cribs prior to this. There were two or three cribs in the month of December, 1870, full. They would get a car once in a while; ship out some, and fill up again. I suppose the cribs were in that condition awaiting shipment, about a week in that month. They were filled with corn in the ear. The three bins would fill forty cars. We never got enough cars at one time to empty these bins. In the beginning of that month, we would not receive more than two at a time, and it would be two or three days, and sometimes a week, before we would get any others. I think they had some more cribs built. They were not entirely emptied before March, 1871. One was emptied to make room to build the warehouse. There were ten bins in the elevator full of corn, in September, 1871, the month after the elevator was completed, that would hold ten car loads each of shelled corn; four hundred bushels were loaded into a car. At the same time there were about four thousand bushels of oats in the basement. This was awaiting shipment all the time. He would get a couple of cars, and then he would wait four or five days before he would get a couple more. During that time not more than three cars came at a time. It was about the same in October, 1871. In December, 1871, I think he had cribs built outside, filled with corn. Two cribs, ten feet wide and forty feet long. They were about

two-thirds full. This was in the months of November and December. I don't think he got this all moved before the next Spring. He would get five or six cars a month at that time. Things were in about the same state in January and February, 1872. In March, 1872, he was building more cribs to store grain. Transportation was about the same in April, May, June and July, 1872. I think the bins were all full in August, when I left. I think there was a little heat in one of his large cribs in March, 1872. I saw some of this corn put in. It was in good condition. The crib had a good shingle roof on, and had cracks for ventilation. After it heated, it was rehandled. I assisted in rehandling it.

"I did not have charge of the receipts of grain for plaintiffs. I had no personal knowledge of the amount of grain purchased while I was in their employ, nor in any one month. I have no knowledge of number of cars of grain shipped by them during that time. My statement of the furnishing of four or five cars a month by the company was a guess. He made purchases of grain during these two years, and shipping grain all the while; take it into his warehouse from farmers, and shipped it out from his warehouse. I do not know how much he had at any one month, during the two years I was there. I do not know any thing about how many cars he received. I did not hear any demand by plaintiffs on the agent for cars whilst I was there.

"I helped to load the cars frequently. The cars were run up to the elevator on the side track. I assisted doing this a great many times. We could load twenty cars a day for a few days. . The corn in the cribs had to go out into the warehouse to be shelled, before loading in the cars."

Richard Morton : " Am one of the plaintiffs in this suit. Sylvester Root is other plaintiff. Firm name was R. Morton & Co. This suit commences for 1870 and 1871. Mr. Root's interest commences on May 1st, 1871. We tried

to keep accurate book accounts of grain stored there for shipment, and the amount actually shipped, and where to. I have part of those books here. Have the grain ledger, the shipping book, and the duplicate bill of lading book. In the first part of September, 1871, we had stored at the village of Kentland about six thousand bushels. I think I made a demand, either in writing or orally, every day from the 1st of August, 1871, on the agent or officers of this defendant company, for cars to transport that grain in. I would ask the agent for so many cars—possibly two, possibly five, possibly ten—different amounts, as to the case needed. I don't recollect the exact amount now. In the first ten days of September, it would have taken fifteen cars to have transported all the grain on hand.

"This grain was in the ear, and we could readily shell and load five cars a day. Whenever I would speak to them it would be for that immediate day or the next. I would tell him at the time where I wanted to ship it to. We were making our principal shipments to New York; occasionally to Boston. If he had any cars he would give them to us. If he had not, he could not. The supply had fallen short fifteen cars up to this time—the first third of September. What was in store in September was a gradual accumulation from possibly the 20th of August. I began to make my demands as soon as grain began to accumulate—that would be the 20th of August. Up to the 10th day of September there was an accumulation of fifteen cars. I think these fifteen car loads were moved about the next May or June. We kept ear corn in the cribs; as soon as it was shelled it was placed in the bins. If cars had been furnished us at the time demanded, we would have shipped that corn to the New York market in two days. The custom there was for the shippers to load. About the 1st of October, 1871, I think we had about forty cars of grain. We were making demands daily to the agent for cars for transportation.

They were not furnished fast enough to supply the demand. I think the demands were possibly five a day, and we were furnished probably, on an average, one a day. I don't think, from my recollection now, it was one a day. That would be twenty-six cars a month. I don't think we received quite that many at that time. I stated to the agent we wanted to ship east, to New York, Philadelphia and Boston. I think in the month of November, 1871, the grain had accumulated to the amount of seventy cars; that would be twenty-eight thousand bushels. This was the gradual accumulation of what was left over from the other months.

"I can not tell from memory the number of cars we shipped in November. In the latter part of December we had in the neighborhood of eighty thousand bushels, six thousand of which were oats. We still made the same demand upon the railroad company every day. We had received from the 15th of November to the 25th of December. This eighty thousand bushels included the accumulations from other months, and the amount we had added to it.

".The increase was not any more in January, 1872, because I had every thing full. I built cribs across the road from the warehouse. Along the latter part of November the grain was accumulating so rapidly, and the railroad was not furnishing any transportation to amount to any thing.

" I went to Pittsburgh, talked with the general freight agent; came back; took two or three grain men to Columbus. Saw vice-president of defendant company, and they promised to furnish us transportation. Some time during the Summer they had organized a freight line among the grain men, called 'Circle P,' or Pennsylvania Company, to operate on the lines of the Pittsburgh, Cincinnati, and St. Louis Railway Company. Before that the Union and National lines were the recognized freight line of the defendant company.

They were the cars that were furnished us. We met. Mr. Thaw in Columbus. He was vice-president at the time of defendant company. He told us he would furnish all the 'Circle P' cars that they had; that they would not send any past Kentland at all. Told the farmers how we were situated, and they commenced bringing in their grain livelier than they had done.

"That was in the latter part of November, or the first part of December; we still did not get any cars. Everybody got out of money, and we begged the farmers to keep their grain at home; they did so. This is the reason why we had no more accumulation the last of December than we had at first. The large accumulation we had on hand at that time was because of the promise made by the vice-president. We had between seventy thousand and eighty thousand bushels on hand on the 1st of February, 1872.

"During February our receipts were light. We had no room. I don't think over fifteen cars were furnished us this month. I asked daily for five cars. He could not give me any satisfaction. The assistant superintendent, Mr. Hill, could not give any; would not give any; did not reply to any letters. The general superintendent, Mr. Caldwell, would not pay any attention to letters. I made a formal demand on the freight agent for one hundred cars, in five to ten per day. It was a written demand." Demand read. Dated the latter part of January, or the first of February, 1872. Demand states that plaintiffs have seventy thousand bushels of grain to ship, and demand one hundred cars for transportation of same, at from five to ten cars per day. We received no response, either in the way of cars or letter. Demand was addressed to Mr. Stewart, who lived at Pittsburgh, Pa.

"I received no more cars in February than in January. We could have, and would have, loaded these one hundred cars, had they been furnished us in accordance with the demand. I could have loaded at that time fifteen cars

a day. I told the agent, if he would give me a train, we would load it the same day. A train was seventeen to twenty cars. I did in one day load eighteen. In March the stock had commenced to decrease, as the receipts were less than we were shipping out. Possibly we had sixty-five thousand bushels on hand at that time. We still kept demanding as previously. We received possibly thirty or thirty-five cars that month. I did receive as many as I demanded. Never at any time did they supply one-fourth of the demand up to that time. In April they commenced to deliver us cars more plentifully than in previous months. They were not sufficient, however, to remove the accumulations during that month. The supply of cars was greater than to transport the amount of grain we were receiving during that month. In May they gave us enough to transport accumulations and all. We preferred to receive grain and ship it at once. Commenced buying again and storing for shipment on August 1st, 1872. We had no accumulations up to the 15th of October, 1872. We had then probably two thousand bushels. We then made demands every day for cars. We would have paid for the transportation of this grain the customary rates of freight if cars had been furnished us.

" The freight was not demanded until the grain was at the terminus. The amount of grain brought to this station in 1870 and 1871 was about the same as it was in 1872. At that time there was no other means of transporting grain to any city of the East.

" I know, of my own knowledge, how much grain I had in the warehouse when I made these demands. About these particular dates the rates were advanced. They advanced the rates, while the grain was accumulating, five cents per hundred pounds. We got at the amount we had on hand by judging from the size of the pile. This grain was stored in the elevator and the crib on September 10th, 1871. There were fifteen cars of grain in there. Possibly five cars shelled, and ten cars unshelled, to the

best of my recollection. We have talked about it a good many times.

"I made a bill at one time, and sent it to Mr. Stewart, of this, but not in September, 1871. It was a bill for damages. I made it out in February, 1872.

"If I made the statement, in my examination in chief, that none of it was shelled, it was a mistake.

"I think the first demand I made for cars was about August 1st. I did not give any accumulations until September 10th. I could not tell when I made the second demand. I made demands for cars every day. I could not say how much grain I had on the first of August to ship. It was about the 10th of September, that we made demand for about fifteen cars. We next made an examination of amount of grain we had on hand about September 28th, or October 1st. Mr. Keefe and Mr. Cunningham made the examination with me. Next examination about 10th of October. Same gentlemen were with me; purpose of estimating amount of grain on hand. Had about forty cars then. Another examination in November. Mr. Keefe was with me again. Mr. Martin was with me; he was in my employ. In latter part of December all our bins were full. Bins hold eighteen thousand bushels of shelled corn. Had upwards of fifty thousand bushels in elevator, in house. Had one crib that would hold seventeen thousand, but think I had twenty-five thousand in it. Had two additional cribs across the street. Had five cribs, all told. Cribs would hold about fifty-two thousand bushels, and were all full.

"Mr. Martin was with me on two or three different occasions when I made estimates. Freights had advanced to highest point, about October 20th or 25th. I made examination about December 20th. About thirty thousand bushels of corn in the five outside cribs, and one thousand eight hundred to two thousand under the drive-way. I demanded at this time two hundred cars, at from five to ten per day. That was about all I could use, all I could

handle. I made a demand every day, of the agent at Kentland, of from five to ten cars, from the 1st of August, 1871, until the 15th of May, 1872. I did not make the demand every day myself. Mr. Martin, who was engaged in handling grain for me, and Mr. Johnson, my book-keeper, were authorized to make demands for me in my absence. Mr. Martin also demanded them when I was present. From August 1st, 1871, to June 1st, 1872, I had at that station, I should say, three hundred thousand bushels of grain. During that time received and loaded seven hundred cars, I should think. Do not know how much grain I bought in any one month, or the number of cars received and loaded.

" The three hundred thousand bushels was for two years instead of one. From August 1st, 1871, to May 1st, 1872, it was about one hundred and seventy thousand bushels. I received transportation for the whole amount between 1st of August and 1st of May. We were buying wheat every day and shipping every day, as we could get transportation. During this time there was not a day but what we wanted to ship grain from Kentland to New York. It would average four times a week, that Martin or I made a demand for cars. We shipped whether there was a high or low market. The demand for one hundred cars was for points east of Pittsburgh.

" In 1872 I made a demand of a car from Mr. Ritchie, the agent, for Harrisburgh, Pennsylvania. I made demand of cars running from Kentland to Pittsburgh; sometimes got them, sometimes not. They never refused a car; if there were any empty cars we got them all the time. I did not load them all the time when I could get them. We demanded cars for points east of Pittsburgh, but were willing to take any kind of cars. They did not refuse, but did not furnish, them. We shipped grain to Piqua, to Urbana and to Toledo.

" By taking the corn from the wagons into a bin, and putting it through our elevator, then through spout into

a bin, we could put twenty-five thousand bushels into the seventeen-thousand-bushel crib, because a great deal would shell and keep accumulating in the crib. When we made estimates the grain was in bins and cribs, and we knew the capacity of the same. I have had experi- ence of sixteen years in the business of handling grain. Have made observations of changes grain underwent at certain seasons of the year. Some seasons corn will com- mence sweating, when in large quantities—generally in March—more particularly in May and June. All Indian corn, shelled, will go through this process; on the ear we don't notice it so much.

"Gave notice to agent of defendant, at different times, of corn heating, and demanded transportation; I should say about April 1st, 1873, and March 15th, 1872. I have no memorandum of dates of heating—never made any. I had about sixty thousand bushels of corn on hand in March, 1872. Have no memorandums of amount on hand when estimates were made. I got these estimates from my books."

Patrick Keefe : " Live in Kentland—nearly nine years. Have been merchant and grain dealer seven or eight years. My attention was called to the amount of grain plaintiffs had at Kentland in the latter part of 1871, and the early part of 1872, by Mr. Morton. I made an esti- mate of the amount of corn he had there. Went there, I think, in December, 1871, and January, 1872, at two or three different times. I estimated the amount, measured the bins and cribs; think there was between sixty thou- sand and seventy thousand bushels. Was at the depot several times when Mr. Morton asked for cars. It was customary for shippers to go there once or twice a day, to ask for cars; and was there frequently when Mr. Mor- ton asked for them and ordered them. When he had none he would say that he would get them as soon as he could; that they were doing all they could to get cars.

" Mr. Morton's cribs were emptied sometime in the fol-

lowing spring—May or June. It was worth about a cent a bushel per month to store grain there in such elevator bins as Mr. Morton had. Storage of corn in crib worth about three-fourths of a cent per bushel. Cribs cost, probably, three hundred dollars. They must have held sixteen thousand or twenty thousand bushels. The one attached to the warehouse we do not call a crib properly; a part of the warehouse. The storing of corn there was worth about sixty dollars per month, or seven hundred and twenty dollars per year. Mr. Morton's improvements there were worth ten thousand dollars. I only pretend to say how much corn he had on one occasion. Mr. Morton was constantly shipping grain from there—buying, shipping and receiving. Part of the sixty thousand bushels he had on hand in December were shipped before May or June of the next year."

Sylvester Root: "Am one of plaintiffs. In the month of September, 1872, we were pretty much full of corn— I refer to what was in my warehouse. There were four warehouses there; we only had one, sometimes called the elevator. I speak of the crib that forms a part of the warehouse. We had the warehouse, and the crib that forms a part of the warehouse, in 1872. There are ten bins, calculated to hold some one thousand eight hundred bushels each. Crib was eighty-three or eighty-four feet long, twenty-four feet wide, and, I think, twenty-six feet high. These bins and crib were full up at this time. It was put there for shipment. I know nothing of any demand for cars for shipment of that grain at that time. In October, before I went east, they were full. I know nothing of the latter part of October. They were full about the middle of November, and in December of the same year. I think cars were obtained more freely in January, 1873, and the quantity was fluctuating; it was being shipped out. A man named Cameron superintended warehouse then. Mr. Barnes was also there. The grain was lowered in the bins one-sixth—perhaps one-fifth—at

that time; some days probably one-quarter, and filled up again. In February and March, I think about the same as January. Along in the Summer of 1873, it was pretty well cleaned out. From January it continued to be diminished. I don't think it was ever cleaned out at all. There were not less than four or five thousand bushels in at any time that I noticed it.

"Mr. Morton had the whole management. I made no orders at all, but I saw it going out and coming in.

"I went to Columbus August 16th, 1871, to see the officers and agents of the Union and Star lines; and also on September 16th. The expenses were about twenty-three dollars to Columbus—forty-six dollars for the two trips.

"I went to Buffalo for the purpose of obtaining White and Red Line cars. This defendant was using some of these cars over their road, between Kentland and New York. That was September 5th, 1871. Expenses some thirty-two dollars.

"I went to Peoria to see Mr. Goss, I think the 21st or 22d of September, 1871. I went at request of Mr. Morton. Mr. Goss was travelling agent of the Union and Star Lines of cars, and had general supervision of this division. The cars of these lines were being used at this time by defendant for transporting grain. We got them for a few days more plenty, after I saw them. Expenses to Peoria were fourteen dollars. Went to Logansport October 24th, 1871, to get cars from Col. Hill, superintendent of the road. I said we were in want of line cars for New York and Philadelphia. He said they were furnishing them as fast as they could, and that the shippers at Kentland were getting their fair proportion. After making these personal applications, we would generally get cars much faster for a few weeks, and then they would gradually drop off. Fare was four dollars to Logansport. Went to Union City October 2d for cars—for purpose of getting White lines. Expenses to Union

City about seventeen dollars. Was in Union City again January 17th, 1872, and March 26th, 1872. Expenses on the 17th of January the same; and on March 26th went to Indianapolis to see Mr. Gale; expenses to Indianapolis about twenty-three or twenty-four dollars. Was to Logansport very frequently. Have not got all the times; almost every week, after cars, that Winter of 1871 and 1872. Must have been there a dozen times; fare itself was four dollars each time.

"The National, Union and Star Line cars were in general use on the road. White Line, Merchants' Dispatch Line and Red Line were passing over perhaps every day, and transporting grain eastward.

"The White, Red and other lines I mentioned were not so generally used. When we got these cars, we had to go off the road and meet the agents of these particular transportation lines. When I went to Columbus, I went to see the officers of the transportation lines. On August 16th, 1871, I learned that these line cars belonged to organizations or corporations who controlled and owned them. I presume I was in the warehouse, on an average, every week. The company was receiving and shipping all the while. I do not know the amount of grain received or shipped in any one day or week. I do not know amount of transportation furnished us for any one day or week or month; the books will show. There is generally more or less grain in a warehouse. It was not an unusual thing to have thirty thousand or forty thousand bushels on hand at the commencement. If we would have had all the transportation we wanted, there would have been, comparatively speaking, no grain on hand in the warehouse. Every grain dealer at Kentland was anxious to get transportation. There was lack of cars and locomotive power on this road. These Pennsylvania cars have all been added since; Pennsylvania Company cars have been put on since. Defendant has increased its rolling stock since 1871. Col. Hill and Mr. Judd said so. Mr.

Judd is local agent at Logansport. The yield of corn in Newton county, Indiana, was about one-fourth larger in 1871 than it was in 1870; about the same in 1872 as in 1871. I went to see Col. Hill about these line cars. He said he would give us our fair proportion of them, and was doing so. That he would give us all of these line cars he could, and then make a fair distribution of them among the shippers. There was a general complaint at Kentland that we got more than the others. I went to Union City for White Line cars, and got them from an agent of another line, and went upon another road. I don't know that the White Line cars went by another than the defendant's road, or that the Red Line cars only went as far as Logansport, and then went on another road. In January, 1873, the quantity of grain was reduced about one-sixth. In February I should think about one-fifth more, and kept reducing it until finally it was all out. I should think it was August before it was all moved out."

John A. Martin: "I was in the employ of R. Morton & Co., at Kentland, in year 1871, handling grain in their warehouse up to middle of August, 1872. I was superintendent for plaintiffs. I commenced there about middle of July, 1871. I can not tell what quantity of grain they had in store in September, 1871. In September they were running full all the time. After the first of September, for six or eight months right along, we were running full all the time.

"They hired men to handle it over, shovel it around one way or another, most every way you can think of, to keep it from spoiling. They must have had an average of three men a day, pretty nearly all the time from the first of September on until sometime in the Spring. They always kept five men, and these were in addition to the five men. They paid them one dollar and a half a day.

"I mean to say that three men were at work pretty

much all the time for five or six months, shovelling corn to prevent it from heating there. This corn was in the cribs, that was heating. They were full most of the time. Corn is apt to spoil in January, if it is put in wet. I have known merchantable corn—corn that would sell in the market—put into an open crib out doors—corn in the ear—that would heat in the months of December, January and February. We thought these were proper cribs, and the corn spoiled in them. This corn was spoiled nearly all the time; whenever we would shell it or use it, we would find spoiled corn. We shelled whenever we got cars. I don't think old corn was heated in September; new corn would spoil. I don't remember whether it was spoiled in October or not. I remember having men hired pretty much all the time. They claimed it was necessary in October, 1871, to shovel it over, to keep it from spoiling. They had been shovelling grain there. I don't know whether it was corn, or what it was. I don't remember whether the oats heated or not. I don't know what months, nor how long, but I guess they worked about the last six months I was there. They had men most all the time shovelling grain around, keeping it from spoiling. They had men there in May and June.

"I think they were shipping in the month of May. My recollection is, that, for six months in the Spring and early part of Summer, they had an average of three men handling corn, and corn was heating all the time.

"I was the weigher. I received the corn as it came, from the farmers' wagons. It was husked pretty generally. I don't know of receiving any corn that was already spoiled."

Patrick Keefe, recalled, testified: "From 1st of October, 1872, to the 1st of June, 1873, the value of the warehouses and bins for storage would be one thousand dollars."

Richard Morton, recalled, testified: "The usual rate of storage is one cent per bushel for shelled grain. For

1872 and 1873 about one thousand dollars of expenses were incurred in rehandling grain, caused by delay in furnishing transportation. The agent at Kentland, or officers, never said Columbus was their terminal point, and as far as they shipped grain. I never knew what the rate of freight was to Columbus. Our rates of freight were computed to New York, and they gave us those rates. The freight was all paid to one person. There was no refusal to accept it for the whole line. During 1870, 1871, 1872 and 1873, they were receiving freight at Kentland and shipping grain directly to New York, and receiving freight for it. They gave us bills of lading, and the freightage would be paid at the terminus. The cars they furnished us principally, they would not allow us to load unless we sent them east of Pittsburgh. I think the rate from Kentland to New York City in September, 1871, was forty-five or fifty cents per hundred. The first half of October it would be fifty-five and the last half sixty cents. The first part of November it was advanced to sixty-five cents, and remained that during the Winter, till the 1st or 15th of May. In September, 1872, they were about fifty; the 15th of October they advanced to fifty-five again; the last part of October made sixty cents, and on the 1st of November advanced to sixty-five cents. It remained there until next Spring, until we were cleared out. The grain we had on hand in 1871 and 1872 was worth in Kentland thirty-five and forty cents per bushel. From September, 1872, to May, 1873, it was worth from twenty-five to thirty-two. I want to change value in 1872 and 1873 from twenty-seven to thirty-five.

"I have been engaged in the business of buying and selling grain sixteen years. Had been in business several years before this matter came up, on the line of this road. We held our grain until transportation was furnished us, and shipped to any point we could get cars to go. Sent some to Toledo at a loss. The loss was less by

shipping to Toledo than by holding and shipping to New York. There was a market for corn in Pittsburgh. I made no effort to ship the corn to Pittsburgh and sell it. There was a market at Chicago for corn. We could not obtain cars to ship there. We did not demand cars of Mr. Chaffee or Mr. Ritchie for Pittsburgh or Chicago. I demanded of them cars for the East. I didn't want to ship it to Chicago. We paid about the same price in Kentland as it was worth in Chicago. I have shipped corn to Chicago since then. We made efforts to ship it to other points beside Toledo and New York—any others we could obtain cars to. I tried to obtain transportation for Cleveland, for Boston, Pottsville, Harrisburgh and Springfield, Mass. Cleveland is on another line of road. Could not get transportation to Cleveland. We made arrangements with the superintendent of the Cincinnati, Columbus and Indianapolis Railroad, and they refused to haul them. I had eighteen cars on the side track at Union City, and they refused to take them; the Pittsburgh, Cincinnati and St. Louis officials refused. The company would not haul them out. I can not mention any officials who refused to deliver cars to us. None of the line cars would be permitted to be loaded for points west of Pittsburgh. Pittsburgh, Cincinnati and St. Louis cars, and Columbus, Chicago and Indiana Central cars, were used as local cars. It is the company's cars—the company have brought into court. Those cars were used on the road, and also the National and Union Line cars. They were used to haul freight to points beyond the line of the road. I was not told that those line cars were controlled by the corporations owning the road. I knew they were controlled by a company independent of the railroad company. I went to see Mr. Thaw as vice-president of the Pittsburgh, Cincinnati and St. Louis Railroad Company to obtain transportation. Mr. Thaw told us they were building. I paid a man for keeping books

of my expenses at Kentland during this time. I paid out six hundred dollars in handling the grain, not altogether to keep it from heating. I changed it about to make room. The bulk of it, six hundred dollars, was to keep it from heating. It was pretty close to it. Have gone over my books to ascertain the amount. The last examination was made last Spring. Will not swear that I paid out six hundred dollars for that particular purpose; the books didn't describe it that way; it didn't describe it on account of heated corn; paid out to certain parties, and I added it together. I put the amount down on a piece of paper last Spring, for another purpose. I presume it is destroyed. I think it was a thousand dollars I paid in the next two years. I think a hundred and ten days were entered in my book, 'Labor for handling grain, to keep it from heating,' in the years 1872 and 1873. A hundred and ten days for four men. One of the men, William Burton, is in court. I think I have placed it at a very low estimate.

"My time going after cars was worth ten dollars a day, in 1871, 1872 and 1873. I consider it worth about four thousand dollars a year. I spent a good portion of it at this particular time. Mr. Root only went as I sent him. I did not charge for sending him. I spent more time going after cars than Mr. Root—more than three times as much, and took longer trips."

Patrick Keefe, recalled, testified: "I have taken notes from *New York Commercial Exchange* of what corn was worth on the fifteenth of each month. From ten to twelve days was usual time of transit to New York. Corn was worth in New York, November 1st, 1871, from seventy-six to seventy-seven cents; November 16th, seventy-eight cents; December 14th, seventy-seven cents; January 18th, seventy-two to seventy-three cents; February, seventy-two to seventy-two and one-half cents; March 14th, sixty-five to sixty-seven cents; April 18th, 1872, seventy-one to seventy-one and one-half cents. Corn was worth seventy-

one to seventy-one and one-half cents, according to quality; May 16th, seventy-five and one-half cents; November, 1872, was seventy-two cents; December, 1872, sixty-five cents; January 16th, 1873, from sixty-three to sixty-four cents; February 20th, sixty-four cents; March 13th, sixty-three and one-half cents; April 17th, sixty-three and one-half cents; May 15th, sixty-four and one-half cents."

R. Morton, recalled, testified: "November 16th, 1871, I had corn sold at eighty and one-half cents; December 16th, 1871, seventy-nine and one-half cents. I shipped to commission merchant, who sold it and reported to me, and I am giving the results of his statement.

"The 16th of December, corn was worth seventy-nine cents in New York market. Our corn was marketable corn. January 1st, 1872, it was worth seventy-seven to seventy-seven and one-half cents. February 1st, seventy-two cents; pretty close to seventy-two cents all that month. March 1st, sixty-nine cents. March 15th, seventy cents. April 1st, seventy-one cents. The next year, November 1st, sixty-nine to sixty-five cents. December 1st, sixty-three cents; during December it ranged sixty-three and sixty-three and one-half cents. January, February and March, from sixty-one to sixty-five cents, all that time. The market was on a sliding scale, gradually advanced until November 16th, and then a very gradual decline, down to April 15th.

"I shipped to four commission merchants in New York, one principally. I obtained this report, on which I based my opinion of valuation, from Teft & Truesdell. I went over the papers on last Tuesday—the accounts of sales to me. The papers are at Kentland. I have my grain ledger and shipping book here. I am to some extent positive as to prices. I tried to remember the whole of them. I have given the best of my recollection. I can not tell what corn was worth April 4th, 1872. April 1st, I think it was sixty-three cents. I was thinking of 1873. 1872, I say seventy-two cents. December 1st, 1872, I

think it was worth sixty-five cents. April 1st, 1871, I think it was ninety-three cents. In April, 1872, I think sixty-nine to seventy cents; I could not tell which. January 1st, 1872, what I shipped sold for seventy-seven and seventy-nine and one-half cents; one car in November for eighty and one-half cents. I could not recollect the prices all the way through. About January 1st, I sold at seventy-seven and seventy-seven and one-half; the 20th, I think it was worth seventy-two or seventy-five cents. My corn was number one. It would quote at Chicago high mixed corn, a little better grade than number two."

On behalf of appellant:

B. M. Chaffee, sworn, testified: "In 1871, was employed by the Pittsburgh, Cincinnati and St. Louis Railroad Company at Kentland, as station agent. Left there November 7th, 1871; know Mr. Morton and Mr. Root. They made frequent demand for cars through September, October and November, while I was there. They made demands for cars to New York, Philadelphia and Boston. Line cars they wanted, not our own cars. National Line, Union Line, Circle P Line and White Line; those were the principal ones; sometimes the Commercial Line. These lines were not controlled by defendant. I have heard Morton talk of making arrangements with superintendents and general managers of those lines. He sent to Union City for them. He knew the defendant had no control of them. The plaintiffs demanded Pittsburgh, Cincinnati and St. Louis cars, and Cleveland, Columbus and Indiana Central cars, and got them. No complaint was made to me of a failure to furnish such cars. The supply of cars was abundant for the business at that time. The scarcity of cars was caused by the fact that there was much more corn bought that year than ever before. They wanted line cars, so that they could go through without transfer. The defendant's cars are not allowed to do so. The grain shipped in defendant's cars had to be transferred, at Pittsburgh, to cars of the Pennsylvania Rail-

road Company. Plaintiffs had a fair proportion of the cars shipped to my station.

" Went to that station in 1868. Think defendants were receiving freight, while I was there, directly for New York and Philadelphia. They always asked for line cars, I don't remember that they failed to load any kind of cars offered them. They wanted line cars, so that they might go through without transfer. I think there was an additional charge of five dollars at Pittsburgh ; am not positive. I know our company did not control the line cars. The superintendent told me so. They controlled as many as were given to them. We had plenty of cars for local business. There were times when the plaintiffs would not use our cars. I can't remember any particular time, but they didn't demand cars frequently for Cincinnati or Chicago. I don't remember that they refused cars to New York or Philadelphia. They sometimes fitted up cars with grain doors. I think there was more corn in 1871 and 1872 than in 1870. They were not as anxious to get Pittsburgh, Cincinnati and St. Louis cars for New York. I think they loaded every car we placed at their disposal for that point. I think they simply expressed a preference for line cars.

" I don't remember that he demanded any company's cars that were not placed at his disposal. He was supplied to all local points.

" I furnished through bills of lading for grain to plaintiffs. I did not represent that the defendant was a common carrier from Kentland to New York City. I billed the cars to Logansport—some of them to Pittsburgh— either one or the other. While I was there in 1871, we furnished to the plaintiffs transportation for grain from Kentland to New York. I do not remember the number of cars we furnished. I have a memorandum that I made, from which I can state the number. My reports are made from these records. This record was made as the freight was shipped out. These books contain copies

of the way-bills of these cars, billed to Morton & Co. Copies were furnished to them. I gave Morton & Co. bills of lading for the same cars. Have examined these books within a few days. I remember that cars were furnished Morton & Co. during those months, and grain was transported, or left the station in them. Can state pretty nearly the number of cars. It would average about thirty a month. The grain was shipped to Pittsburgh and a number of places on the Pennsylvania road. I should say one-third was shipped to New York.

" Kentland had about twelve hundred population. The cars were billed to Logansport and Pittsburgh, in pursuance of instructions from my employers. The grain they tendered for transportation to New York would be billed to Logansport or Pittsburgh, and they would take care of the bill farther on. In the first instance, I made a bill of lading for New York or Philadelphia, as they directed."

D. T. Bacon: " Am acquainted with plaintiffs. Am at the present time, and have been for five or six years, in the employ of the defendant company. Was in defendant's employ in the Summer of 1871, and from that time on to the present. In the Summer of 1871, I was train-dispatcher. Since October, 1871, I have been master of transportation. As master of transportation, my duties were to distribute cars to the different stations, and giving directions for the movement of trains. I remember of applications having been made for cars for Kentland station, by the agents, in the Winter of 1871 and 1872, and on until October, 1873. During that time Kentland station had a little more than its fair proportion of cars. I had personal applications for cars from plaintiffs. When applications were made by plaintiffs, they were for through cars, for eastern points; points east of Pittsburgh and Cleveland. I mean line cars, that go through without transfer. The cars of the defendant, and of the Columbus, Chicago and Indiana Central, were not allowed to be sent east of Pittsburgh. Merchandise

and grain shipped in defendant's cars, for points east of Pittsburgh, have to be transferred into the cars of the eastern company, at Pittsburgh.

"These lines are known as the Star Union and the National Line Transportation Companies. These were the cars principally requested by the plaintiffs. These transportation companies are independent organizations, common carriers of freight, and bills of lading are issued by the officers of such organizations. The defendant has no control of such line cars, except when they are upon the line of its road for use, and they are then distributed as needed along the line. They were sent to the order of the superintendent of the division, Colonel J. Hill, at Logansport, Indiana. My office was at Logansport. We distribute cars in proportion to the requirements, or to the order of the station agents at the stations, giving grain orders preference to any other orders, unless it would be perishable property. Grain always had the preference to lumber.

"Kentland station had its fair proportion of company cars and line cars, when requested. We were not always able to furnish line cars, because we hadn't them to furnish. We made very great efforts to the officers owning and controlling the cars, to have them supplied. We applied to Mr. Thaw, at Pittsburgh. Mr. Gray, at Columbus, was the western general manager of the line. We could only get these cars except under orders of the officers of the transportation companies, and such as came to local stations on our road, from the east. We would haul these cars past Logansport, and past other stations that needed them, to give them to Kentland, Goodland, and other stations in that vicinity, that had large quantities of grain to forward. These line cars, sent to our road with west bound freight, were always returned loaded. We never sent any line cars east empty. The cars of other railroad companies, not at all connected with defendant company, came upon this line of road,

always loading them back if we could. We would not load them beyond where they were to leave our road, unless it was in the direction of their own road, or over their own road. The requests for cars were made on a daily car report, made up at 6 P. M. every day, by letter frequently, and nearly every day by telegraph, saying there was great urgency for the cars. By the daily car report the number of cars would be stated; by the other reports, it would say, 'Give us cars, any quantity of them;' 'unlimited quantity,' frequently. The kind of cars were mentioned in the report. We also always furnished to Kentland station all the line cars that we could spare, or had the control of. We never failed to furnish such cars when we had them, or refused when requested. The rule generally was that there were enough of these line cars there to fill the orders. Defendant's cars were not generally used for transportation of grain from Kentland to east of Pittsburgh, because of the transfer at Pittsburgh. Our company was not allowed to run east of Pittsburgh, and shippers objected to the transfer, because of the fear of the loss, although the company assured them there was no loss. This transfer was made from car to car, and sometimes through elevators. We have an arrangement by which every grain from one car gets into the other. There was a delay at Pittsburgh, in the transfer, because of the great number of cars arriving there daily, which could not be handled. We were directed at one time not to allow any cars loaded to be transferred at Pittsburgh, until the accumulation had been removed there. There was a blockade at the eastern end of the route, at Jersey City, and could not receive any more cars there; cars loaded were held there, and this gave us no supply of cars. They were using our cars for store-houses. This was in the Fall and Winter of 1871 and 1872.

"The delay occasioned by this blockade was nearly three weeks; this blockade occurred also in the Fall and

Winter of 1872 and 1873; it occurs nearly every Winter, owing to the freezing up of the river, or blockade, at New York. There was great difficulty in the Fall and Winter of 1871 and 1872 at Jersey City, in handling grain rapidly. Line cars were allowed to pass through Pittsburgh. A bill of lading is simply a receipt giving the through rate of freight. The agents of the different lines establish the through rates. The line from Chicago to New York, by way of Logansport, Columbus and Pittsburgh, is a through line. Freight from Kentland to New York is billed to Logansport, and from there rebilled by the officers of the line that it is sent by. The line from Kentland to New York is not a through line. Freight from Kentland to Logansport is rated by charges agreed upon, and from Logansport to New York it is charged under a tariff agreed upon by the officers of the companies representing the lines to New York. The advantage to the shipper of a bill of lading from Kentland to New York is, that it is frequently accepted as a receipt against freights. It is not always necessary to give a bill of lading, if the freight is agreed upon and understood.

"The company had no more control of these cars with a P in a circle, or Pennsylvania cars, than they had over other line cars. There are times when we have more cars than we have use for. In 1871, we had not cars enough at our disposal to move that grain.

"We had sufficient number of cars in 1870, 1871, 1872 and 1873 to remove all the grain offered for shipment to New York from Kentland station. They were not furnished, because the plaintiffs did not demand any cars. Plaintiffs did not demand our cars; they wanted line cars. Mr. Morton, I think, in every instance, requested line cars. He always asked for line cars. I do not recollect whether he said he would not take any other kind of cars. I think cars sent to that station were taken away sometimes, and loaded at other stations. I do not know why. Our cars were not allowed to go east of

Pittsburgh, by order of the road connecting with us at Pittsburgh. Kentland was not a competing point, and had not through rates to New York. I mean by competing point, a station where two through lines, or connecting lines, run through. We did not send any of our cars to State Line, nor any line cars either. The Circle P Line was a new line put on our road about that time—about the Winter of 1871 and 1872. The Pennsylvania Company owned these cars. I do not know whether the officers of our company were interested in either the Circle P, or the National Line, or the Union Line. These cars were run on our road for a mileage. They were not recognized as belonging peculiarly to our line and the Pennsylvania Central. They run on a great many other roads. The National Line and Circle P Line were recognized by shippers as a through freight line east over our road.

"These line cars were recognized by shippers on all roads in Wisconsin or elsewhere as through cars. Mr. Thaw does not exercise any control over the distribution of cars on our road. The grain that accumulated in the years 1871, 1872 and 1873, and all freight, could have been moved at the time by our own transportation.

"During one or two of these years cars remained at Kentland for sometimes a week or ten days at a time—sometimes longer. I don't know in what season of the year. I have known of their being there in the Winter season. These line cars spoken of ran sometimes over the Baltimore and Ohio."

James W. Ritchie: "Know the plaintiffs. Am agent of defendant at Kentland. Took charge of station there November 8th, 1871. I have charge of the distribution of cars sent to that station. Delivered cars to plaintiffs from November 8th, 1871, to July, 1873, for transportation of freight to New York. Furnished them about seven hundred cars from November 8th, 1871, to August, 1873. The proportion of the cars billed through to New

York of plaintiffs would run between a fourth and a third. Some months Mr. Morton would not ship more than two or three cars to New York. He shipped through to the New England States, Pennsylvania, Reading, Franklin, New Jersey, Springfield, Massachusetts, Boston, Baltimore, Toledo, Detroit and Harrisburgh.

" Both plaintiffs made requests to me for cars during this time, for transportation of their grain east. The general demand was for National cars or line cars—Red Line or White Line—through cars. These line cars are through cars to New York and Philadelphia, and ours are only to Pittsburgh, and different points on the line of our road. Enough transportation was offered during all this period of time to remove the grain at Kentland station. When we were short of cars at any time, it was National and Union Line cars. There has not been a scarcity of company's cars for any period of time.

" If I did not furnish all the line cars requested,' it was because I did not have them to deliver. When I had them, the plaintiffs always got their fair proportion. Mr. Morton said in my presence, that the grain transported in company's cars had to be transferred at Pittsburgh. That was after the trip he had returned from Pittsburgh in 1872. He said: 'It is swept out, and you don't lose a grain from one car to another.'

"Some months plaintiffs would get twenty-five, some thirty, some sixty, and, on an average, about thirty-three or thirty-four cars a month. In February, 1872, he got sixty cars. They varied from that down to eight or ten cars. In May, 1873, he only got six cars. In August, 1871, he got twenty-three cars; September, 1871, forty cars; October, ten; November, forty-six; December, thirty-two; January, 1872, thirty-five; February, sixty; March, twenty-eight; April, forty-four; May, six; June, fifteen; July twenty-four; August, 1872, nineteen cars; September, fifteen; October, fifteen; November, twenty-two; December, sixteen; January, 1873, three; February,

five; March, eleven; April, fifteen; May, thirty-six; June, thirty-two; July, fourteen; August, sixteen.

"These cars were loaded as they directed, and pulled out under their directions. After getting his cars and loading them, he sent them where he pleased. He did not demand cars for shipping grain to any particular place, but rather demanded a particular class of car, that would take grain to any place.

"I furnished the company's cars as they demanded them. Sometimes I furnished them fifteen cars. I don't know that I said to the plaintiffs that I could furnish them all the cars they wanted, if they would transfer the grain at Pittsburgh. Nor do I say that they refused cars upon such conditions. The plaintiffs did not load every thing I offered them that would hold grain. In February or March, 1872, I had ten Pan-Handle cars that I tendered on my track to Mr. Morton. He said he wanted Wabash cars. He came into my office and said he wanted cars, and I told him I had some Pan-Handles. He wanted to know if I could get him some Red Line cars to run over the Wabash road.

"Morton did not load the Pan-Handle cars, but they were taken to Goodland and Remington, and loaded. He did not accept of these cars. These cars would run over our line of road. Don't know that I tendered him any cars before, that he refused. The only reason he gave for not taking these cars was because he wanted Red Line cars. When we loaded grain in Little Miami or Pan-Handle cars, it was all transferred at Pittsburgh. I think Mr. Morton thoroughly understood this. During the time I was there, Morton did not continually want or ask for cars. There were two or three times when he had no grain to ship."

Richard Morton recalled: "I paid Mr. Brown, for looking for cars at Union City, one hundred and fifty dollars.

"I did not load the ten Pan-Handle cars, because I

had promised the superintendent of the Wabash road that I would lead the Red Line, and I wanted to do so, so that when I got in a pinch I could get some more. The Pan-Handle and Red Line cars were there. That was about the time I could load eighteen or twenty cars a day."

This is the substance of the entire evidence.

In determining this case it must be kept in mind, that the complaint is not against a common carrier, for failing to deliver goods which he has received and undertaken to carry to a given destination. In such a case the carrier can be excused from performing his obligation only by the act of Providence or the State's enemies. And it must be distinguished from a case wherein a common carrier has undertaken, by bill of lading or other contract, to receive and carry goods to their point of destination, and has failed or refused to receive them to be carried. In such a case the carrier does not become an insurer of the goods, and is bound only by the general rule of liability, for a breach of contract.

This action is brought against a railroad company that has become a common carrier, as is alleged, by holding itself before the public as such, and thus has undertaken the general public duty of carrying goods for all persons who may apply, and necessarily thereby has incurred the liability incident to a breach of such general public duty, to all persons injured thereby, without any special contract in the given case. The case, therefore, must be governed by the general law regulating the remedy for a breach of a public duty.

The implied obligation of a common carrier, arising from his relation to the public, is limited by the termini of his own route. Merely connecting with other routes, which he does not own, operate or control, will not make him a common carrier over such connecting routes. By the common law, a person who holds himself out as a common carrier is not obligated thereby to carry goods

at the current freights, unless he has a particular route be-
tween certain fixed termini; nor is such carrier bound
by his general public obligation to provide other means
of transportation—as the coaches of other lines, or the
cars of other roads—than such as he owns, uses or holds
out to the public on his own route for that purpose. / In
America, according to the early history of its settlement,
the condition of the country and the habits of the peo-
ple, when carrying goods scarcely existed as a separate
business, it seems that the common law, requiring a car-
rier to transport goods at customary rates, or, upon re-
fusing, be held liable for a breach of public duty, was
never generally adopted, even within the termini of the
carrier's route.

In the case of *Gordon* v. *Hutchinson*, cited below, CHIEF
JUSTICE GIBSON, of Pennsylvania, as late as 1841, uses the
following sensible remarks:

"But rules which have received their form from the
business of a people whose occupations are definite, regu-
lar, and fixed, must be applied with much caution and no
little qualification to the business of a people whose oc-
cupations are vague, desultory, and irregular. In Eng-
land, one who holds himself out as a general carrier is
bound to take employment at the current price; but it
will not be thought that he is bound to do so here.
Nothing was more common formerly, than for the wagon-
ers to lie by in Philadelphia for a rise of wages. In
England, the obligation to carry at request upon the car-
rier's particular route, is the criterion of the profession;
but it is certainly not so with us. In Pennsylvania, we
had no carriers exclusively between particular places, be-
fore the establishment of our public lines of transporta-
tion; and according to the English principle we could
have had no carriers, for it was not pretended that a
wagoner could be compelled to load for any part of the
continent."

. Mr. ANGELL, in the late edition of his treatise on the law

of carriers, section 126, approves of the same principle, saying:

"And it has been considered in this country that the rule of the common law that a person who holds himself out as a common carrier is obligated to take employment at the current price will not apply, unless the carrier has a particular route between certain fixed termini; and that, although in England the duty of the carrier to carry at request upon a particular route is the criterion of the profession, it should not be so in this country."

It might have been that the failure to recognize generally the common-law rule upon this point, in America, induced the Legislature of Indiana to provide regulations for running cars, and making railroad companies liable in case of their refusal to carry passengers or property, or to deliver the same at the regular appointed place. 1 R. S. 1876, p. 710, sections 29–30. But the statute nowhere lays this duty upon railroad companies beyond the termini of their respective lines or routes. The following authorities will support these views: *Gordon* v. *Hutchinson*, 1 Watts & S. 285; *Ballentine* v. *The North Missouri R. R. Co.*, 40 Mo. 491; *The Galena & Chicago Union R. R. Co.* v. *Rae*, 18 Ill. 488; *Illinois Central R. R. Co.* v. *Cobb*, 64 Ill. 128; *Wibert* v. *The N. Y., etc., R. R. Co.*, 19 Barb. 36; *The Evansville & Crawfordsville R. R. Co.* v. *Duncan*, 28 Ind. 441; Angell Carriers, sections 25–26; *Oxlade* v. *The N. E. R. W. Co.*, 15 C. B., N. S. 680; *Hales* v. *The London & N. W. R. W. Co.*, 4 Best & S. 66; *Peet* v. *The Chicago & N. W. R. W. Co.*, 20 Wis. 624; 2 Redfield Railways, 142.

The evidence in this case is voluminous, but we thought it necessary to a full presentation of the case to set it out. It shows that the appellant held itself out to the public as a common carrier of goods between the termini of its route, namely, from Chicago, in the State of Illinois, by the way of Kentland, in the State of Indiana, to Pittsburgh, in the State of Pennsylvania; also, that it run its

cars in connection with the Star Union and the National Line Transportation Companies, connecting at Pittsburgh, and thus forming a through line east, to the cities of New York, Philadelphia and Boston; and that, when furnished upon its own line with cars belonging to the companies east of Pittsburgh, it shipped goods through to the eastern cities without a transfer at Pittsburgh; but the evidence does not show, nor tend to show, that the appellant ever professed to own, operate, or in any manner control, cars belonging to companies east of Pittsburgh, except when they were furnished to it by the eastern companies, to use in transporting goods over its own line. The cars of the appellant did not, and could not, pass east of Pittsburgh, which fact was well known to the appellees; and it was also well known to the appellees, that appellant did not and could not control the cars of the eastern companies only as they were furnished to it by their owners for the purpose of through transportation. The obligation of a common carrier, in the absence of an express contract, is no greater than his attitude to the public professes or indicates. In this case the appellant and the appellees, and the companies east of Pittsburgh, were alike interested in carrying the goods of the appellees to market; and the evidence seems to show that they all used reasonable knowledge, skill and diligence to attain that end.

The appellees generally demanded of the appellant White Line or through cars, and it appears that they were furnished by the appellant whenever they could be had from the eastern companies. There is no demand upon the appellant for its own cars shown, when the cars were not furnished accordingly; and it appears that there was no time covered by the controversy in this case, when the appellant had not a sufficient number of cars at the service of the appellees to carry all the grain they desired to ship, within a reasonable time, upon the route of the appellant to Pittsburgh; and there was no implied obli-

gation against the appellant to furnish to the appellees through cars, unless they could be had from the eastern companies. The whole current of the evidence tends to establish these facts.

It appears to us by the record that the case has not been tried on its true legal basis, and that there are several links in the chain of evidence, necessary to hold the appellant liable, which are wholly wanting. We think the new trial should have been granted, that the parties might have placed their rights on their true grounds, formed their issues, and presented their evidence accordingly.

There are other questions raised in the record, upon the law and the evidence; but, upon a new trial, this opinion will indicate what the rulings upon them should be. For this reason we do not examine them now.

The judgment is reversed, with costs, and the cause remanded, with instructions to sustain the motion for a new trial, and for further proceedings.

## ON PETITION FOR A REHEARING.

BIDDLE, J.—This case has been again argued ably by written briefs, and, on petition for a rehearing, orally and earnestly argued at length.

No new authority has been cited impairing the rules of law laid down in the original opinion, as we view them, but several cases have been cited which appear to us to support our original views.

Doubtless a common carrier may so hold himself out to the public as to make himself liable for not receiving and carrying goods beyond his own line; or, by a special contract, he may make himself liable for not receiving and carrying goods beyond his own line; or, if a person not a common carrier in fact, and not holding himself out to the public as a common carrier, undertakes by contract to carry goods to a given point, he will

be .held liable for a breach of his contract as a common carrier.

In this case the action is not founded on a special contract, but on the public duty of a common carrier. The action arises *ex delicto*, and not *ex contractu*.

At the common law, before the enactment of our code of procedure, it would have been an action of trespass on the case, and not for the breach of a contract; and the difficult question before us is, whether it has been shown that the appellant was a common carrier, as alleged by the appellees, and had committed a breach of its public duty, to the injury of those who complain. We do not think the statutes of this State—the common law being in force—materially affect the case.

The greater number of authorities cited by the appellees arise upon a breach of contract, in not properly delivering goods received to be carried, instead of not receiving goods to carry, and are, therefore, not directly applicable to the case we are considering.

The cases most relied upon by the appellees, and we believe the strongest in their favor, are, *Crouch* v. *The London and N. W. R. W. Co.*, 25 Eng. L. & Eq. 287, and *Wheeler* v. *San Francisco and Alameda R. R. Co.*, 31 Cal. 46.

In the former case, the termini of the defendant's line were both within the realm of England, but it was in the habit of carrying parcels and packages to Glasgow, in Scotland, and so held itself out to the public. It received the package of the plaintiff, which he desired to be carried to Glasgow, with other packages for the same destination, belonging to other persons; but, instead of carrying the plaintiff's package to Glasgow, it was delivered at the terminus of the defendant's line in England, while the other packages, belonging to other persons, were carried on to Glasgow. For this discrimination against the plaintiff, without any cause shown, the defendant was very properly held liable. But we do not clearly see how

this case supports the views of the appellees, when the breach of duty complained of is in not receiving the goods to carry, instead of not delivering them at their proper destination, after they had been received.

In the California case, the complaint, after averring that the defendant was a common carrier of passengers and freight over its railroad by cars, and across the bay of San Francisco, to the city of San Francisco by steamboat, alleges, that the "plaintiff was a resident of" the "county of Alameda, and doing business in said city of San Francisco, and theretofore in the habit and accustomed to make trips back and forth daily on said railroad and steamboat, and that on the day last named he entered defendant's cars at a regular station on said route, known as the 'Alameda Station,' and while said cars were there on a regular trip for the purpose of receiving freight and passengers to San Francisco, and that he entered the cars in good faith as a passenger, for the purpose of being conveyed to said city of San Francisco, in the usual course of his business in said city, and that he tendered the usual rates of fare and offered to pay the same, being the same sum charged for other passengers, to wit: the sum of twenty-five cents, and requested defendant to carry him to San Francisco as such passenger. Yet said defendant, not regarding its duty, but intending to injure this plaintiff in this behalf, refused to accept said fare, and that after plaintiff had proceeded on said cars to said steamer, * * * as such passenger, and while he was still yet ready to pay his full fare, and while he had fully conformed to all the rules and regulations of defendant in the premises, and was still so conforming and conducting himself in a proper manner, and while there was ample room on board said steamer, and while other passengers were received as passengers on board thereof, said defendant, by its agents, employees and servants, did, wrongfully, unlawfully, and with force and arms, and against the will of this plaintiff, seize hold of and expel,

eject and remove him from on board of said steamer to said wharf, and there held and detained him until said steamer left said wharf for San Francisco, whither she proceeded with her freight and passengers; and defendant then and there refused to permit plaintiff to travel on said line," etc.

This complaint was held good against a demurrer alleging the insufficiency of the facts stated to constitute a cause of action, and this is all the case decides. Surely this decision is correct; but wherein it supports the appellees in the case we are considering, we do not clearly perceive. The demurrer admitted that the defendant was a common carrier along its road by cars, and across the bay by steamboat; that it had been in the habit of carrying the plaintiff daily, as a passenger, along its road and across the bay for the usual fare; and that, upon this given day, it refused to receive his fare or carry him as usual, but forcibly ejected him from the boat. Such a case bears no analogy to the one we are considering. The case, on demurrer, was argued upon the ground that the defendant's charter only authorized it to build and run their railroad, without any power to employ steamboats in connection with their line; and while much of the language of the court when pronouncing the opinion, applied generally, would seem to favor the views of the appellees in the case we are considering, when we look to the premises and conclusion of the case—to which, and to no greater extent, it is an authority—they do not support the appellees in the case now before us. We are, therefore, still satisfied with the law as laid down in the original opinion.

It is stated that we did not decide the questions of law made upon the instructions of the court to the jury. We examined such as were objected to and insisted upon in the briefs, and did not find any of the objections well taken. We looked no further, but presumed that all

those not objected to, or objected to and not discussed, in the briefs, were correct.

It is claimed by the appellees, that, if they show some evidence in the record which fairly tends to support the verdict, they are entitled to an affirmance of the judgment. This is true, if there is some evidence fairly tending to support all the facts necessary to the verdict; but certain facts may be supported by sufficient evidence, while other facts necessary to the verdict are not supported by any evidence. In such cases, the appellees are not entitled to an affirmance of the judgment. In the present case, there is evidence strongly tending to show that the appellees were delayed in the shipment of their corn, and that they suffered damages thereby; but we can find no evidence in the case fairly tending to show that the appellant was a common carrier eastward beyond the city of Pittsburgh, in the State of Pennsylvania, except as cars were sent to it for the use of the appellees, from railroad companies east of Pittsburgh; and there is no evidence fairly tending to show that the appellant ever refused to furnish the cars so sent to them by the roads east of Pittsburgh for the benefit of the appellees. There is evidence strongly tending to show that the appellant was a common carrier, in its own cars, from the place of shipment to Pittsburgh, in the State of Pennsylvania; but there is no evidence fairly tending to show that there was ever any demand made by the appellees on the appellant for cars to ship their grain to Pittsburgh, when the cars were not furnished according to the demand. Several of these points, barren of evidence, were necessary to be established by the appellees before they were entitled to recover.

The case seems to have been tried, and the damages assessed, upon the ground that the appellant was a common carrier from the place of shipment to the city of New York, and other cities east of Pittsburgh, and is now attempted to be sustained upon the ground that

there existed a contract between the parties, when the complaint declares upon the general public duty of the appellant as a common carrier. Hence it was that we said in the original opinion, that it apeared to us by the record that the case was not tried on its true legal basis, and that there were several links in the chain of evidence wholly wanting; and that the new trial should have been granted, that the parties might place their rights on their true grounds, form their issues, and present their evidence accordingly; and we still think we were right in the statement.

Besides the views we have taken in the original opinion, it may be added that the evidence fairly tends to show that the appellees had been and were experienced in the business of buying and shipping grain; that in the year 1870 they were well acquainted with the appellant as a common carrier, its line, means, mode and capacity of carrying; with this knowledge they purchased grain for shipment, in the years 1871, 1872 and 1873, constantly demanding a class of cars for its shipment which the appellant as constantly informed them it could not furnish, only as they were sent to it from roads east of Pittsburgh, and laying their damages in their complaint, as running from the month of March, 1871, to the month of July, 1873, during all of which time the carrying capacity of the appellant was not diminished, nor its mode or means of carrying materially changed.

This evidence tends to show that the appellees purchased grain for shipment, which they had reason to know the appellant could not carry in the mode they desired and insisted upon. A common carrier is not bound to depart from his ordinary and usual mode of business in receiving goods to carry. Edwards, Bailments, 442, sec. 586.

There remains yet to be decided a question arising upon a cross-assignment of error, which was not discussed in the original briefs and not noticed in the origi-

nal opinion. As it is a question which is likely to arise on a new trial, it is desired that we decide it now.

During the trial the appellees offered evidence to the jury to prove that the corn which they held for shipment, by reason of the delay of the appellant in furnishing means of transportation, underwent a process known as sweating or heating, whereby it was greatly damaged, in consequence of which the plaintiff sustained a loss to the amount of eight thousand dollars. The evidence was objected to by the appellant, the objection was sustained, and exception reserved.

The general common-law rule, that the carrier is responsible for all losses not occasioned by the act of Providence or the State's enemies, does not include losses which arise from the ordinary wear and tear of goods in the course of transportation ; nor from their ordinary loss or deterioration in quantity or quality, in the course of the voyage ; nor from their inherent or natural infirmity and tendency to damage, as for the loss or ordinary decay or deterioration of oranges or other fruits, from their inherent nature, or from the spontaneous combustion of goods, or their tendency to effervescence or acidity, or from suffering any other natural change during transportation. In such cases the carrier is not responsible on his implied obligation, unless the injury has been caused by his fault or delay in receiving or transporting the goods. Story Bailments, secs. 492, 492 *a*.

If, therefore, in this case, the appellees could show that their corn heated in consequence of the fault of the appellant in not receiving and transporting it, whereby they were injured, we think they should have been allowed to do so, notwithstanding the heating process was inherent in the nature of the corn. The case of *The Illinois Central R. R. Co.* v. *McClellan*, 54 Ill. 58, will support these views.

Upon the whole record it seems plain, that substantial justice has not been done between the parties. An affirm-

ance of the judgment, we think, would approve a judicial wrong, while a reversal denies no right to either party, but simply requires a new trial according to the law of the case and the facts proved. .

The petition is overruled; but, as the first error was committed against the appellees, the judgment must be reversed, at the costs of the appellant, and in this respect the original opinion is so far modified.

DISSENTING OPINION ON PETITION FOR A REHEARING.

WORDEN, J.—I can not concur in the views of the majority of the court in respect to the evidence in the cause.

I am of opinion that there was evidence in the cause from which the jury might have fairly inferred that the defendant held itself out to the world as a common carrier between Kentland and the Atlantic cities, and that it failed to furnish the necessary means of transportation, to the injury of the plaintiff. I am of opinion, therefore, that a rehearing should be granted.

Original opinion filed at November term, 1877.
. Opinions on petition for a rehearing filed at May term, 1878.