INMAN & COMPANY v. ST. LOUIS SOUTHWESTEN RAILWAY COMPANY.

Delivered June 25, 1896.

1. **Railway Company—Connecting Lines—Right of Through Shipper to Select Route.**

A railway company, under the provisions of the statute, that where railroads cross each other they shall be considered as connecting lines, and must carry to and from and deliver at such points of connection all freight destined to such point or to points anywhere on the connecting lines, and interchange business on rates prescribed by the State Railroad Commission,—is bound to accept goods destined to a point beyond its line, consigned to or routed over a particular connecting line with which it interchanges business, and to carry the goods to the point of connection, and there deliver them to the other line, upon tender of the through joint rate of freight for the entire shipment. Rev. Stats. (1895), arts. 4440, 4441, 4535-4539.

2. **Same—Duty of Carrier.**

The shipper needs no contract to impose on the carrier the duty thus to forward the goods on payment of the through joint rate established by the railroad commission, as the duty arises by law when the freight is tendered for shipment.

3. **Same—Carrier's Duty to Notify Shipper.**

In case the exercise of the shipper's right to route his goods over a particular connecting line would probably cause delays arising from congestion of business, detrimental to the carrier and the shipper, it is the duty of the carrier to notify the shipper of such fact and allow him the choice as to whether he will take the attendant risks; and if such conditions arise after the carrier has received the goods, its duty is again to notify the shipper and await his instructions.

4. **Same—Shipper's Damages—Local and Through Joint Rates.**

A shipper who is compelled, by the wrongful refusal of the railway company to receive his freight, to ship it to the connecting point as local freight, and to re-ship it there to the point of destination, again at local rates, is entitled to recover the excess of the two local rates over the through joint rate.

5. **Same—Measure of Damages—Market Value.**

Where property is wanted only because of its salability, the measure of damages for a carrier's wrongful refusal to accept goods for shipment as routed by the shipper, is the difference between the market value at the destination to which it was to have been carried, at the time when it should have arrived there, and its value at the same time at the place from which it was to have been sent, less the through freight rate.

6. **Same—Expense Necessarily Incurred by Shipper.**

Upon a tender of goods to the railway company for shipment by delivery at the depot, and the company's wrongful refusal to accept them at the time, the expenses incurred in carrying them to the depot a second time are damages which the owner may recover.

7. **Same—Statutory Penalty for Refusal to Receive Goods.**

The State Railroad Commission having fixed the through rate between certain points over connecting lines, the wrongful refusal of one of such lines to accept goods for shipment consigned to or routed over the other connecting line, to a point of destination on such other line, renders it liable to the penalties imposed by the statute for unjust discrimination. Revised Statutes (1895), art. 4574, sec. 2.

APPEAL from Harris. Tried below before Hon. S. H. BRASHEAR.

*Ewing & Ring,* for appellant.—1.   Let it be conceded that a railroad carrier cannot be compelled to contract for through carriage over a connecting line, and that, in the absence of statutory regulation of through rate, the carrier may decline, as a result of its right to refuse a through carriage at all, to permit the shipper, on a through carriage, to select the route over a connecting line; yet the shipper's right, independent of the commission law, to select the course of transit for his freight, paying local rates on each line, can not be gainsaid, and, in the exercise of this independent right, aided by the commission law establishing without exception a through rate over the continuous mileage in question, the appellants were clearly entitled to the benefit of such through rate, which was all they demanded, and of which they were deprived by the wrongful refusal and conduct of the appellee.   Rev. Stats. (1879), arts. 4251–4255; Railway v. Baird, 75 Texas, 256; Paul v. Wedemeyer, 56 Texas, 287; Continental Bank v. Weems, 69 Texas, 497; Railway v. Adams, 63 Texas, 207; Railway v. Young, 60 Texas, 201; Wells, Fargo & Co. v. Fuller (Texas Civ. App.), 23 S. W. Rep., 413; Express Company v. Kountze, 8 Wall., 342; Railway v. Myrick, 107 U. S., 102; Transportation Company v. Kahn, 76 Ill., 520; Snow v. Railway, 109 Ind., 425; Hutchinson on Carriers, 102a, 126a, 145, 312, 313; Sutherland's Stat. Con., sec. 235 et seq., sec. 238; Sedgwick, Damages (8 ed.), secs. 97, 101, 104, 107, 127; Kinkley v. Railway, 56 N. Y., 433; Johnson v. Central Railway, 33 N. Y., 611, 612; Railway v. Jones, 149 Ill., 361, s. c., 24 Law Rep. Ann., 141; Railway v. Dey (Iowa), Law Rep. Ann., 441–443; 2 Am. & Eng. Ency. of Law, 869f, 871g, and notes; 8 Id., 970b, and notes; 2 Am. & Eng. Ency. of Law, 871, and note 3. And see, as illustrative, 110 U. S., 667; 2 Law Rep. Ann., 289; 2 Inters. Com. Rep., 763; 4 Id., 261; also Calls v. Railway (Ga.), 12 S. E. Rep., 749.

2.   The statute imposes the penalty for discrimination for failure to transport and deliver tonnage over any connecting line.   In the case at bar the cotton was destined by the shipper to Houston over the H. & T. C. Railroad.   The defendant refused to receive and transport this cotton because it was destined over the H. & T. C. Railroad.   The statute does not say over a connecting line, but over any connecting line.   Who shall determine what such connecting line shall be if not the shipper? The statute does not say that it shall be the duty of the carrier to transport the cotton over a connecting line, or over some connecting line, but it says any connecting line.   If the carrier is to have the right of selecting the connecting line, regardless of the instructions of the shipper, how could a case of discrimination under this portion of the sub-section ever arise?   In what other way could a carrier discriminate in favor of one connecting line as against another?   How could a case of refusal on the part of the carrier to ship over any particular line be otherwise made out?   Does not the statute clearly contemplate the contingency of a carrier refusing to ship freight over some particular connecting line? If not, under what circumstances can its provisions apply?   Its pur-

pose is to punish discrimination. The discrimination is defined to be a refusal by the carrier to do a certain thing.

3. The doctrine ab inconvenienti was invoked. It was argued that blockades might occur, and the railroads be put to great inconvenience and loss, if the shipper were accorded the right to route. It was not explained why this would not occur as well under the aforetime rule giving the shipper the right to route by paying local rates. But a sufficient answer to the contention is, that there is nothing in the law making the through rate in any manner dependent upon the carrier having the right to route. The courts must declare the law as it is written, and can not legislate exceptions into its body. Sutherland's Stat. Con., sec. 238. Aside from this, the argument ab inconvenienti is certainly as strong in favor of the shipper as in favor of the carrier, as the facts of this case, with potent force, illustrate and reflect. The idea thus advanced is, however, purely imaginary. Where the shipper designates the conncoting carrier, if the goods can not be delivered to such connecting line by reason of an obstruction thereat, it is only necessary for the receiving carrier to notify the shipper, and relieve itself from all liability from delay. The rule is thus stated: "Where a railroad company is unable to forward freight by the next connecting line, owing to an obstruction thereof, it is bound to retain the goods and notify the owner so that he may reclaim them." 2 Am. and Eng. Ency. of Law, 871; and see note 3, showing that the carrier is not liable for delay after giving such notice. It is preposterous to suppose that other shippers would direct the routing over a blockaded line, and those who had already done so could not complain. It follows that there is no practical reason for denying the shipper the right to route his goods.

4. The court's conclusions are contrary to the evidence, and against the manifest weight thereof, inasmuch as it conclusively appeared from the proofs, that appellee had, in the particulars specified by the assignments, wrongfully discriminated against the appellants. Texas Railroad Commission Act., (Sayles' Texas Supp., art. 4280a,) sec. 15, particulary sub-section b thereof, and secs. 17 and 23; Int. Com. Com. v. Railway, 145 U. S., 263, construing "under advantage."

*Marsh & McIlwaine*, for appellee.—1. A carrier is not bound to carry beyond his own line in the absence of a statute requiring him to do so. Hence he cannot be compelled to receive goods offered to him for transportation to a place to which his line does not extend. Railway v. Baird, 75 Texas, 256; Railway v. Railway, 110 U. S., 667; People v. Railway, 55 Ill., 95; Railway v. Morton, 61 Ind., 539; Express Co. v. Pitlock, 109 Mass., 45; Hutchinson on Carriers, sec. 115.

2. When, however, a carrier contracts to go beyond his own line he has the right to select the agencies by which the goods are to be forwarded when the termination of his own route has been reached. Railway v. Railway, 110 U. S., 667, and authorities therein cited.

3. The duty of a railway company that has received goods for trans-

portation beyond the termination of its own line to deliver the goods to one of its connecting lines, when the end of its route has been reached, rests upon a contract, express or implied, of the company to do so, and in the absence of such a contract or undertaking on the part of the company its whole duty is performed when it has carried the goods to the end of its own line and there stored them for the owner or consignee. Hence, the law does not require a railway company to give to the owner of goods offered for transportation beyond the termination of its own line a bill of lading binding the company to deliver the goods to one of its connecting lines when the end of its route has been reached. Railway v. Myrick, 107 U. S., 102; Lotspeich v. Railway, 73 Ala., 306.

4. Even though appellant had the right to demand that appellee should receive and transport the cotton upon the terms and conditions demanded by them, still appellee being, at all times, ready and willing to take the cotton with the routing omitted from the bills of lading, it would only be liable for the additional charges, if any, that appellant would have been forced to expend when the cotton had reached Houston and for such inconvenience and delay to which they would have been subjected by reason of the routing having been omitted from the bills of lading. Telegraph Co. v. Jeams, 31 S. W. Rep., 186; Railway v. Patterson, 7 Civ. App. Rep., 452.

5. Although the contention made in the first proposition supra with respect to the measure of damages is not correct, yet appellee having been, at all times, ready to carry the cotton to Corsicana on local bills of lading, and there deliver it to the Houston and Texas Central Railway, the measure of appellants' damage would be the difference in the amount of freight that they would have had to pay, and, in fact, did pay by reason of the cotton being thus transported and the through rate to Houston from the stations at which the tender was made. Smith v. Railway, 63 Texas, 322; 2 Sedg., Damages, sec. 842.

6. There was no evidence that appellee discriminated against appellants in respect to the transportation of the cotton, and the action of the trial court in finding that appellants had failed to sustain their case in this respect was eminently correct. Schloss v. Railway, 85 Texas, 601; Murray v. Railway, 63 Texas, 413; Elliott v. Railway, 99 U. S., 573; Interstate Com. Commission v. Railway, 145 U. S., 263; 43 Fed. Rep., 57; Railway v. Baird, 75 Texas, 256; Railway v. Railway, 37 Fed. Rep., 339; Railway v. Tripp, 17 N. E. Rep., 95.

WILLIAMS, ASSOCIATE JUSTICE.—Appellant brought this suit to recover of appellee actual and exemplary damages for its refusal to receive at and transport from the stations upon its road of Frost, Powell and Blooming Grove, by way of Corsicana and the Houston & Texas Central Railroad, to Houston, Texas, a large number of bales of uncompressed cotton tendered to appellee by appellants' agents at the named points, and to recover also numerous penalties for violations of statutes charged in the petition.

There is no question raised upon the pleadings, and a statement of them is unnecessary. The trial below was before the judge, who rendered judgment for defendant upon the ground, substantially, that it had the right to refuse to receive the cotton upon the terms exacted by plaintiffs, and committed no wrong in so doing. Some of the facts upon which the case was tried were admitted by the parties and others were shown by evidence adduced, which is contained in the statement of facts. The findings of the trial judge and his conclusions of law are also in the record. Most of the facts upon which the decision of the main question depends are undisputed, and, as to some of those about which the evidence is conflicting, there are findings of the court below, which must be accepted. Those facts, so far as we deem them material, are as follows:

1. The defendant's line of railroad, running east and west, crosses the Houston & Texas Central Railroad at Corsicana, forming with it a junction and connected roads. The stations of Frost, Blooming Grove and Powell are on defendant's road, the two first named west, and the last named east of Corsicana. The Central road extends south from Corsicana to the city of Houston. All of the named stations on defendant's road are more than 125 miles from Houston.

2. The defendant also crosses or connects at different points with a number of other railroads leading into Houston; by or over which the distance from the stations named is also more than 125 miles.

3. Prior to the transactions in question the Railroad Commission of Texas had adopted a schedule of rates to be charged by the railroads of Texas for the transportation of cotton in bales, known as commodity tariff No. 1, still in force when said transactions occurred, by which the charges for such transportation to Houston from points distant more than 125 miles therefrom was fixed at 59 cents per hundred pounds, for both local and joint application, by continuous mileage. It is not disputed in the case that the tariff was regularly and legally adopted, and that it is obligatory upon defendant and its connecting lines. The local rate prescribed for shipments from the places mentioned to Corsicana was fifteen cents, and from the latter place to Houston, over the Central, was fifty-nine cents.

4. The defendant and each of the other companies owning connecting lines leading to Houston, agreed upon a division of the rate thus fixed for cotton shipped over two roads to Houston from points on defendant's road, by which defendant was to receive 29 cents and the connecting road 30 cents, and this arrangement was in force at the time of the transactions in question.

5. Plaintiffs are and were, at the various dates mentioned below, engaged in buying and selling cotton at various points in the State, among which were the stations before named, at which one R. L. Caldwell was their agent. Between the 1st of September and the 1st of October, 1894, said agent bought and shipped over defendant's road to plaintiffs at Houston, from said points, a large amount of cotton in

bales, upon bills of lading given by defendant's agent, without objection, providing for delivery to plaintiffs at Houston, limiting appellee's liability to its own line, and undertaking that the cotton "Go through uncompressed, via H. & T. C. R. R. Co.," meaning the Houston and Texas Central railroad.

6. By the 8th of October, 1894, plaintiffs had accumulated at the depots of defendant at the places aforesaid 3380 bales of cotton uncompressed, weighing 1,799,120 pounds, and, on that day and afterward at different times, and in different lots, they tendered the same at such stations to defendant for shipment to Houston. In making the tender plaintiffs' agent at first accompanied it with a bill of lading to be signed by defendant's agent, the same as had been previously used in other shipments, which the agent declined to sign. The bill first demanded was as follows: "Received by the St. Louis Southwestern Railway Company of Texas in apparent good order and well conditioned, of R. L. Caldwell, for delivery to order of Inman & Company, or his or their assigns at Houston, Texas, he or they paying freight charges as per margin, the following articles,"—then follows description of cotton. "The rate to be 59 cents per hundred pounds, and the words, 'go through uncompressed, via H. & T. C. Ry.' written in body of bill of lading." Upon defendant's refusal to accept under this bill, plaintiffs' agent tendered the cotton to be shipped upon another as follows: "Received by the St. Louis Southwestern Railway Company of Texas, in apparent good order and well conditioned, of R. L. Caldwell, for delivery to order of Inman & Company, Houston, Texas, care H. & T. C. Railroad, or his or their assigns, at Corsicana, he or them paying freight charges as per margin, the following articles." Then follows description of the cotton and the words, "through rate 59 cents." By both bills defendant's liability was restricted to its own line. This, defendant's agent also refused to sign, and refused to accept the cotton for shipment on either bill, or upon any bill showing routing over any particular road. The plaintiffs' agent then verbally demanded that the cotton be received and so routed as to go by way of Corsicana and thence over the Central to Houston at the through rate prescribed by the commission, and defendant refused to receive the cotton to be thus shipped. The defendant was, however, at all times willing to receive the cotton and carry it to Houston at the through rate of fifty-nine cents, but claimed the right, if it did so, to select the route or the connecting carrier over whose line it should go. It was also willing to carry it to Corsicana on its local rate as a local shipment. Plaintiffs, on the other hand, claimed the right to designate the connecting carrier, to whom the cotton should be delivered, and the route over which it should go to Houston, at the prescribed through rate, but did not claim the right to bind the defendant to carry beyond its own line further than the bills of lading tendered might have had that effect. Defendant waived the payment of freight and made no objection to receiving and shiping the cotton but that stated. The objection which

defendant had to accepting cotton to be routed over any particular rail-road, as stated by the trial judge, was that it might be inconvenient or disadvantageous for it to do so.    There is evidence tending to show that there had been such an accumulation of cotton passing over defendant's road at Corsicana that the Central road could not handle it with dispatch, and that this condition might result elsewhere if the right were conceded to the shipper to dictate the route.    As to the fact stated there is a conflict of evidence, and the court below made no finding as to it beyond that just stated.    Between October 8 and October 31, 1894, plaintiffs, at different times, repeated the demand as before made, which was refused by defendant.

7.    On October 31, 1894, plaintiffs tendered the cotton. for local shipment to Corsicana, which was necessary in order to have the cotton go by the routes demanded by plaintiffs, and the cotton was then properly carried by defendant to that point and delivered to Inman & Co., care Houston & Texas Central railroad, as a local shipment, and was tendered by plaintiffs to the latter railway to be carried from Corsicana to Houston, plaintiff paying 15 cents per hundred pounds as local rate to defendant, and 59 cents per hundred pounds to the Central Company, as freight over its line.

8.    The route by Corsicana and the Central road was shortest and most expeditious and plaintiffs wanted their cotton to go this way in order to avoid extra expense, trouble and inconvenience, resulting from the difference in the terminal facilities and location of depots of other roads, with reference to the compress at Houston at which plaintiffs' cotton was to be compressed and in which some of them were interested. The findings of the trial judge as to losses sustained by plaintiffs and as to exemplary damages and discrimination are as follows:  ·

"IV.    I further find that by the delay in the shipment of the cotton from the time shipment was first demanded by plaintiffs of defendant up to the time the cotton was finally shipped on the local bills to Corsicana, a depreciation in the market value of the cotton occurred at the destination, Houston, whereby the cotton when received in Houston was of less market value at Houston in the sum of $8995 than it would have been when received at that point had the cotton been shipped when first demanded; also that, during such time, plaintiffs paid interest on the amount invested in said cotton, computed upon the depreciated value thereof, in the sum of $425; also that, during such time, the plaintiffs paid $765 for insurance on such cotton, being the reasonable rate and value of such insurance; also that, about the middle of October, 1894, the defendant caused the cotton in question which plaintiffs had previously tendered for shipment, to be hauled away from its depot and grounds, and in hauling the same back for shipment, which plaintiffs were compelled to do, they paid the sum of $227.05, which was the reasonable value and cost of such services.

"V.    I further find that the allegations touching discrimination are not sustained by the evidence, it not being shown that defendant

charged, demanded, collected or received more or less compensation from plaintiffs for like and contemporaneous service, and that they do not so far bring themselves within the statute as to entitle them to recover; also that the allegations touching extortion are not sustained by the evidence.

. "VI. As to the facts relating to the claim for exemplary damages, I find that the action of defendant company in refusing to give the bills of lading as requested was not on account of malice or a desire to oppress plaintiffs, but was based upon the advice of counsel and their belief as to their rights and as to what the court finds was their right."

These findings are all sustained by evidence sufficient to support them, except as shown further on. The cotton seems to have been tendered at different times and in different lots; the dates of the different tenders and the number of bales tendered at each time are not shown. Nor does it appear what was the market value of the cotton at the places of shipment at the time when it should have been delivered at Houston, had it been received and carried as demanded.

*Opinion.*—The first question upon which the decision chiefly depends is, whether or not the defendant was justified in refusing to receive and ship the cotton under the facts found. In support of its position its counsel argues that the demand made upon it was to assume an obligation with respect to the cotton extending beyond a safe carriage of it over its own line and a delivery of it at the terminus thereof to the consignee. This contention is based on the forms of the bills of lading tendered. The first one does stipulate for a carriage to Houston and a delivery there. Whether or not, in view of the fact that it also limited appellee's liability to its own line, and in view of the legislation in this State to which we will presently refer, it was sought by the form of this bill of lading to impose upon defendant any greater duty than, under the law, it was bound to assume, we need not now decide. The second bill contained no such stipulation. It provided for the delivery of the cotton "to order Inman & Company, Houston, Texas, care H. & T. C. Railroad, or his or their assigns, at Corsicana." This language undertakes to bind the defendant to deliver, not at Houston, but at Corsicana. If the latter stipulation were omitted, the language, "for delivery to Inman & Co., Houston, Texas," would naturally mean that the delivery was to be made at Houston; but when care is taken to add the words "care H. & T. C. Railroad or his or their assigns at Corsicana" an obligation is stated which is to be discharged by so delivering at the latter place. If the cotton had been carried under it and delivered to the Central road at Corsicana, it could not be claimed that defendant was under any further obligation. But, if there were any doubt about this, it is removed by the evidence, which shows that the plaintiffs' effort was simply to have the bill show the routing, so as to get the benefit of one rate of freight as for through shipment, and at the same time secure the right to have the cotton sent to Houston

over the Central road.    This purpose was fully made known to defendant, and this was the claim that was disputed.    If plaintiffs were entitled to demand this much as a legal right, such right was unequivocally denied by defendant, regardless of the form of any bill of lading demanded, and the decision cannot be made to depend on the form of the bills of lading when the recognition of the right was otherwise refused. The objection that defendant was called upon to carry beyond its lines, when it was only asked to carry over its own road to its junction with a connecting carrier and there to deliver to the latter, cannot be maintained.    In thus carrying it would not have had to go off its own road, where it had the right to use all of the facilities afforded at the point of connection, and would have assumed no liability for the safe carriage of the property after it had left its hands.    The question then seems to be simply whether or not the defendant was bound in law to accept goods destined to a point beyond its line consigned to or routed over a particular connecting carrier with which it interchanged business, and to carry them to the point of connection and there deliver them to the second carrier to be carried by the latter on to their destination.

In maintaining the negative of this question, counsel for appellee argue that a carrier is only bound to transport property over his own route, and is not bound to accept goods for carriage over connecting lines upon which he does not undertake to carry; that the duty imposed by law upon the carrier is performed when he has taken the goods as far as his route reaches and has stored them.    And from these propositions counsel further argue that the carrier is not bound to receive goods destined beyond his line, and to carry and deliver them to the connecting carrier who may convey them to their destination; that if he voluntarily receives them, an implied obligation arises, from such receipt, to act as forwarding agent for the shipper and, as such, to deliver to the connecting carrier; but that such obligation is purely contractual and voluntary and no duty is imposed by law to assume it; and hence if the carrier does assume it, he may do so upon condition that he be allowed to select the connecting carrier to whom he shall deliver.

' With reference to the circumstances under which carriers may refuse to receive goods, Hutchinson says: "So he may of course refuse to take goods if he does not carry to the place to which the owner wishes to send them."    Hutchinson on Carr. (2 ed.), sec. 115.    This is undoubtedly true, as ,stated, but it does not sustain appellees' argument.    It does not follow that the carrier is not bound to accept for delivery to a connecting carrier to which his line extends.    The case referred to by the author shows this.    Pitlock v. Wells, Fargo & Co., 109 Mass., 452. Money was tendered to the express company in New York to be carried to Boston, when the company did not undertake to carry goods between those points, or over any part of the way.    It was not a case in which the carrier carried part of the way, and was asked to send the property as far as its line reached, and then deliver to a connecting carrier.    The other authorities referred to equally fail to sustain the point.    The People v.

Railway, 55 Ill., 95, was an effort to compel, by mandamus, a railway company to deliver grain in bulk into an elevator in Chicago, which was not reached by its lines. The court held that the company was under no obligation to go beyond its own lines and to use and pay for the use of the tracks of other parties in order to reach the warehouse of the complaining party. But in so holding the court carefully distinguished the case from that of Vincent v. Railway, 49 Ill., 33. In the latter case it was held that, both by common law and the statute of Illinois, it was the duty of a railway company, when it had a siding reaching a grain warehouse in Chicago, and where the course of business was to deliver grain in bulk into the warehouses when thus situated upon the tracks, to so deliver at plaintiff's warehouse.

Railway v. Morton, 61 Ind., 539, was a suit in which the plaintiff sought to hold the railway company liable for failure to furnish cars to transport goods beyond its terminus, over the roads of other companies, and not for a refusal to transport and deliver to the connecting roads; and it was held that the evidence did not show that the defendant had so held itself out as carrying over the other roads as to make it its legal duty to furnish cars which could go through over all of them. There was no claim that the company had refused transportation to the end of its own line. In Myrick v. Railway, 107 N. Y., 106, Justice Field says: "A railroad company is a carrier of goods for the public, and as such is bound to carry safely whatever goods are entrusted to it for transportation within the course of its business to the end of its route and there deposit them in a suitable place for the owners or consignees. If the road of the company connects with other roads, and goods are received for transportation beyond the terminus of its own line, there is superadded to its duty as a common carrier that of forwarding by the connecting line; that is, to safely deliver the goods to such line—the next carrier on the route beyond. This forwarding duty arises from the obligation implied in taking the goods for the point beyond its line. The common law imposes no greater duty than this." Again, on page 107, he says: "The general doctrine then, as to transportation by connecting lines, approved by this court and also by a majority of State courts, amounts to this: that each road, confining itself to its common law liability, is only bound, in the absence of a special contract, to safely carry over its own route and safely to deliver to the next connecting carrier, but that any one of the companies may agree that over the whole route its liability shall extend."

Under the language of the first sentence, the appellee's counsel contends that the duty of the carrier to forward by connecting carrier arises only from contract, and that hence the duty to receive the property to be so forwarded is not imposed by law, while the last sentence is claimed by appellant's counsel as authority for the proposition that the duty is imposed by law upon the carrier as such, and that hence, his reasonable charges being paid, he is bound to receive and carry to the connecting line and there deliver. The question before us was not in

the case cited.   The court was considering the question of liability of the receiving carrier for a wrong delivery, made at the destination of the goods, by the connecting carrier, and was not called on to consider the nature and source of the duty of the receiving carrier to deliver to connecting lines.   But in Railway v. Manufacturing Company, 16 Wall., 318, the question was as to the capacity in which the carrier held goods, carried by him to the end of his line and deposited in his warehouse awaiting delivery to the connecting carrier and destroyed by fire before such delivery.   The opinion uses the following language: "In such cases it is the duty of the carrier, in the absence of any special contract, to carry safely to the end of his line and to deliver to the next carrier on the route beyond.   *   *   *   Public policy, however, requires that the rule should be enforced, and will not allow the carrier to escape responsibility, on storing the goods at the end of his route, without delivery or an attempt to deliver to the connecting carrier.   If there be a necessity for storage, it will be considered a mere accessory to the transportation, and not as changing the nature of the bailment." This was said, it is true, in a case in which the carrier had accepted and carried the goods to the end of its line, but it was said in definition of the duty imposed by law, in the absence of contract, upon the carrier as such, as is emphasized in another part of the opinion, where the court admits the truth of the argument made by the counsel for the carrier, that it was bound in law to receive and transport the goods, saying:   "It is true the company were obliged to carry for all persons, without favor, in the regular course of business, but this obligation did not dispense with a corresponding obligation on its part to inform the shipper of any unavoidable circumstances existing at the termination of its own route in the way of a prompt delivery to the carrier next in line."   See also, 2 Am. & Eng. Ency. of Law, 869, and authorities cited.

These authorities hold that the duty to deliver to the connecting line is that of a carrier, and not simply that of an agent created by contract. To impose upon the carrier the duty of receiving and carrying to the end of its line and there delivering to a connecting carrier, over whose line the property is destined, requires no contract.   The right of the shipper to have his goods delivered to the connecting line is involved in the right to consign them as he chooses.   He cannot compel the first carrier, at common law, to assume any obligation beyond his own line, but, in our opinion, he has as clear a right to compel such carrier to carry to the end of his line and deliver, according to the usual course, to a connecting carrier with which there is an established method of doing such business, as he has to have delivery made to any consignee whom he may select.   The custom of storing in warehouses, when the destination of the goods or terminus of the line is reached, is wholly inapplicable in cases where there is a connecting carrier at such terminus, over whose route the property is to pass and with whom the first carrier has established connections and facilities and terms for interchanging

business. Such a delivery is as much a part of the ordinary carrying business of such a carrier as is the carrying and delivery to an ordinary consignee. And the tracks and terminals forming the connection are as much part of the carrier's line as its main road. That this is true is clearly brought out by the distinction made between the two Illinois cases before noticed. Of course, if it is sought to secure from the carrier any service beyond that just defined, of carriage and delivery, some agreement for its performance must be obtained, and, in this way, the carrier may assume the obligation to carry beyond its line, or to do acts as agent of the shipper which the law would not otherwise oblige it to do. As it may assume such obligations or not, as it chooses, it may refuse to do so unless it be allowed to select the connecting carrier with respect to which the superadded service is to be rendered. But this, we think, is not true, even at common law, when it is only asked to carry and deliver to the connecting carrier in the usual way. It may be true, also, at common law, that the duty which we have attempted to define would only exist in cases where the carrier had formed such connections with the other carrier as are shown in this case. But however this may be, at common law the duty of one railroad company to deliver to a connecting road is plainly enjoined by legislation in this State, and the means and facilities are given to enable it to perform that duty. By the Constitution the right is given to any railroad to intersect, connect with or cross any other railroad, and railroads are required to receive and transport each others passengers, tonnage and cars, without discrimination, under such regulations as shall be prescribed by law; railroads are declared public highways and railroad companies common carriers, and power is given to the Legislature to regulate freight and passenger tariffs, correct abuses, and to establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable. Constitution, art. X.

By statute it is provided that railway corporations shall have the right to cross, intersect, join and unite with any other railway, at any point on its route, and upon the grounds of such other railway corporation, with the necessary turnouts, switches and other conveniences in furtherance of the objects of the connection. Rev. Stats., art. 4175. That every corporation whose road is thus intersected shall unite with the owner of the new railway in forming intersections and connections and grant to the new railway facilities therefor. Article 4176. That at the intersection or connection is to be a depot, and both companies shall receive, carry and deliver freight and passengers to and from same. Article 4238, also 4226. That all railway companies shall receive from connecting lines, at point of connection, all freight and passengers coming from such connecting lines and destined to points on or beyond their lines, etc. Article 4251.

That railroads which connect with each other by crossing each other, or otherwise, are connecting lines, and provision is made for the collection and division of the joint freight charges. Articles 4252, 4253,

4254. That railways shall interchange business, and incur a penalty for refusing to do so. Article 4255.

By the act creating the commission it is made its duty to establish joint rates of freight for the various classes of freight and cars that may pass over two or more lines of such railroads. Sayles' Stats. Supp., art. 4280a. Under this authority, as before seen, the commission has established joint rates applicable to the defendant and its connecting lines. The same law contained a further provision hereinafter given. Thus we see, by statute, railroads which cross each other are connecting lines; that depots are established at the junctions; that each of the roads thus connected must carry to and from, and deliver at, such points of intersection or connection all freight and passengers destined to such points, or to points on the line of the other connected road; that they are generally required to interchange business and must do this upon the rates prescribed by the commission. How can it be said, in view of this legislation, that one company whose railroad is connected with another may refuse to accept property destined to a point on such other, merely because it is so destined. The provisions leave no room for such a contention. Railroad companies are plainly required by article 4238 to carry to and deliver at points of connection freight and passengers. By article 4251, each connecting road is required to receive from every other road with which it is connected and carry over its lines any property destined to a point on its own line, or on any line beyond it, with which it also connects. If this cotton had been started on the International & Great Northern and, by it had been tendered to appellee, destined to Houston on the Houston & Texas Central, by the very terms of the statute, appellee would have been bound to receive and carry it over its own road to the Central and have delivered it to the latter, to be carried on to its destination. There can be no reason why such should be its duty in the case supposed, while it is still at liberty to refuse freight tendered at one of its stations, merely because its destination is fixed at a point beyond its line but on a connecting line. It being the duty of one to receive and carry to the junction and of the other to carry on to destination, it irresistibly follows that it is the duty of the first to deliver to the second. The duty arises when the freight is tendered for shipment and the carrier cannot refuse to take it. It is bound to send it to the chosen connecting line as much as it would to any other consignee, and the shipper needs no contract to impose upon the carrier the duty thus to forward. Before the tariff rates were fixed by law, the privilege remained with each carrier to exact payment of reasonable freight charges for carriage over its own line, and the right of the shipper to require any railroad company to carry and deliver to a connecting road was dependent on his payment of such charges. By paying them he had the right, we think, at common law, and certainly under the statutes in force before the commission law was adopted, to require the carrier to accept, carry and deliver his goods to the connecting carrier chosen by him, as before stated.

Since the establishment of the through joint rate, the shipper has the same right upon paying that rate. Railway v. Dey, 12 Law. Rep. Ann., 441-443; Railway v. Jones, 149 Ill., 361, s. c., 24 Law. Rep. Ann., 141.

Many cases are cited by the parties for and against the proposition. As shedding light upon the duty of carriers, generally, in delivering to connecting carriers, the following are cited: Wells, Fargo & Co. v. Fuller, 23 S. W. Rep., 413; Transportation Co. v. Kahn, 76 Ill., 520; Snow v. Railway, 109 Ind., 425; Hutchinson on Carriers, 102a, 126a, 145, 312, 313; Kinkley v. Railway, 56 N. Y., 433; Johnson v. Railway, 33 N. Y., 611-12.

Other cases are cited by appellee in which are discussed and defined the duties imposed upon railroads, as common carriers, by the common law, by legislation of other States, and the Federal interstate commerce law, which are instructive, but which do not conflict, in our opinion, with the views expressed. Denver, etc., Railway v. Atchison, etc., Railway, 110 U. S., 667; Bridge Co. v. Railway, 2 Law. Rep. Ann., 289, s. c., 37 Fed. Rep., 567; Little Rock & Memphis Railway v. St. Louis Railway, 41 Fed. Rep., 559; Lotspeich v. Railway Banking Co., 73 Ala., 306; Coles v. Railway, 12 S. E. Rep. (Ga.), 749.

These cases, especially the Federal cases, readily appear to be inapplicable in view of legislation in this State.

The argument that the exercise of the right of shippers to route the goods over particular connecting lines would probably result in the congestion of business at points of connection and cause confusion and delays, to the detriment of shipper and carrier, should not be allowed to prevail over the law as it is laid down. If such a condition is known to the carrier to exist, his duty is defined in Railway v. Manufacturing Co., supra, to be to notify the shipper of it, and allow him to choose whether or not he will take the risk. If the condition arises after the carrier has received the goods, his duty is again to notify the shipper and await his instructions, in the meantime taking proper care of the goods. 2 Am. & Eng. Ency. of Law, 871, and authorities there cited. Thus the law makes full provision for such contingencies.

We conclude, therefore, that the defendant violated its duty when it refused to take the cotton, recognizing appellants' right to simply route it, and receive the benefit of a through shipment and a through rate over the route chosen. There was not a simple refusal to sign particular bills of lading, but a refusal to take the cotton at all, except upon a condition which the defendant had no right to impose. In order to get it carried, the plaintiffs were required to yield up the right which the law gave them to have it delivered to the Central as a through shipment for the established through rate. For any damages proximately resulting the defendant is liable. In order to prevent the accrual of unnecessary damage, plaintiffs were only required to manage as the situation demanded of persons of ordinary prudence. It is contended that they should have allowed defendant to route the cotton and have held it

responsible for only the increased delay, expense and inconvenience thereby caused. We do not understand that the principle invoked requires the party to yield up the right in question, in order to prevent the other from violating it. He may stand upon his right and after the wrong is done, must still bear himself as a prudent person to prevent unnecessary injurious consequences. This distinction, we think, is recognized in the case of Railway v. Mackie, 71 Texas, 491. But whether this is true or not, the burden was on defendant to show that the cause suggested would have resulted in smaller loss than was occasioned as the natural consequence of the wrong. Railway v. Nicholson, 61 Texas, 497. Sedgwick on Damages, (8 ed.), sec. 227. The facts do not show this.

It is also contended that appellant should have allowed appellee to carry the cotton to Corsicana and have had it carried to Houston by the Central as local shipment at local rates, deducting or recovering the excessive charge made and claiming compensation for only such other loss as resulted from that cause. What we have said above applies partly to this proposition. The course indicated would have been a surrender of the very right in issue. But this contention is virtually taken out of the case by the view taken further on, as to the measure of damages applicable.

Coming to the measure of damages, we think plaintiffs should recover the excessive freight which it paid on the cotton. It is contended that in finally shipping over the Central they should have paid that company only its portion of the joint rate, inasmuch as the cotton came from the defendant's road destined to Houston. But plaintiffs had not the right to require the Central road to receive the cotton as a through shipment. It came to Corsicana as a local shipment with the local rate paid to defendant. Being a local shipment over each road, because of defendant's exactions, defendant should not be heard to say that the plaintiffs and the other carrier were bound to change the character which defendant had forced upon it. The plaintiff having been illegally forced to pay the money, should recover it.

The only finding made by the court below, and the only one authorized by evidence, as to decline in market value of the cotton, is based upon the difference in the market value at Houston at the time when the cotton should have been delivered there, and the value at the time of its actual delivery. We do not think this standard is applicable to this case. It is the measure where the carrier receives goods and delays them in transit. It has also been applied in cases where the carrier simply delays the receipt of the property but does not refuse to receive. Railway v. Smith, 63 Texas, 322; Railway v. Hume Bros., 87 Texas, 211; Railway v. Nicholson, 61 Texas, 491.

But the rule is stated to be otherwise where the carrier refuses to accept in accordance with his contract. In such cases, where the property is wanted only because of its salability, the measure is held to be "the difference between the market value, at destination to which they

were to have been carried, at the time when they would have arrived there if the carrier had performed his contract, and their value, at the same time, at the place from which they were to have been carried, less the freight." There are some qualifications of this rule which are inapplicable here. Hutchinson on Carriers, sec. 774; Sedgwick on Damages, sec. 842; 3 Suth. on Damages, 206, 207; Railway v. Rae, 18 Ill., 488; Bridgman v. The Emily, 18 Ia., 509; Harvey v. Railway, 124 Mass., 421; Lake Co. v. Elkins, 34 Mich., 439.

Many other authorities are cited by the authors referred to which amply sustain their text, and about the rule stated there is general concensus of opinion. The Texas cases referred to are, we think, reconcilable with the rule laid down, considering them as cases where there was no definite refusal to ship. The question is, does this measure apply here? The fact that in this case the carrier was bound by law to receive the goods, while in those cited he was bound by contract, can make no difference. The contention of appellant is that the rule applied in the above Texas cases governs this because defendant did finally receive and carry the cotton. But the answer is, it never recived but definitely rejected the shipment first tendered. There was a refusal on its part to accept on the terms proposed by appellants. The final tender and acceptance was an entirely different transaction, as much so as if different cotton had been offered. There had been a completed wrong committed by defendant and the rights of the parties were fixed. Appellants had their cotton at the shipping points and were at liberty to do as they saw fit. But they had been deprived of the right to have it at Houston at the time defendant ought to have delivered it there, and had lost any difference between its value at Houston and its value at the same time at the shipping points. And, as, in order to get the increased price at Houston, it would have been necessary to pay the freight, they had saved that. We think under the authorities, as well as upon reason, this was the measure of their damages in this respect. The contention that appellants waited only a reasonable time before again tendering the cotton on different terms is irrelevant. The wrong was complete when the property was rejected, and they could not change or affect the rule of damages by waiting for two or three weeks and then shipping on the carrier's terms. As it is not shown that they suffered damage in this particular, under the rule defined, we cannot allow them anything for loss in market value of cotton.

From the view that we take of the measure of damages it follows that interest paid for money borrowed by appellants and cost of insurance on the cotton are not recoverable. The property was in their possession to be disposed of as they thought proper. Continuing to hold and pay interest on money and insurance on the cotton was the course voluntarily chosen by them. Had they sold the cotton for its value where it was and paid the borrowed money and then collected from defendant any loss in market value between those points and Houston, it is evident they would have been compensated. It is true

that had the cotton been taken by the carrier it would have been an insurer during the transportation, and the payment of insurance, in the interval between its receipt and its delivery in Houston, would have been unnecessary; but to get the benefit of the carrier's responsibility the payment of freight would have been necessary, and this was saved.

We think plaintiffs are entitled to recover the expense incurred in carrying back to defendant's premises the cotton which it caused to be removed. This act made it necessary to put this cotton on the grounds twice, when plaintiffs were entitled to have it received when first put there, and thus unnecessary expense was incurred.

The finding of the court below as to the claim for exemplary damages having evidence to support it, we cannot hold that plaintiffs are entitled to recover them.

The finding upon the branch of the case in which it is sought to recover penalties for alleged violation of the act creating the railroad commission does not contain the facts upon which it is based, and we can not see how far it was influenced by the opinion of the court, that the defendant had only exercised a right in refusing to take the goods. There is some conflict of evidence as to facts which may be material to a determination of the questions raised as to the right to recover some of the penalties, which we do not feel authorized to resolve. The provisions of the law which it is claimed defendant violated are those contained in section 15 of the act referred to. Subdivision b of that section is as follows:

"Every railroad company which shall fail or refuse, under such regulations as may be prescribed by the commission, to receive and transport without delay or discrimination, the passengers, tonnage, and cars, loaded or empty, of any connecting line of railroad, and every railroad which shall, under such regulations as may be prescribed by the commission, fail and refuse to transport and deliver without delay or discrimination any passengers, tonnage, or cars loaded or empty, destined to any point on or over the line of any connecting line of railroad, shall be deemed guilty of unjust discrimination: Provided, perishable freights of all kinds and live stock shall have precedence of shipment.' Art. 4280a, Sayles' Stats. Supp., 783; Rev. Stats. (1895), art. 4574, subdiv. 2.

There is no controversy about the facts affecting the application of this statute. The contentions of appellee are, 1, that defendant was not bound to receive the cotton, and hence could have incurred no penalty; 2, that the penalty is prescribed only for a refusal in violation of regulations to be prescribed by the commission, and that as no such regulations had been prescribed, the statute could not operate. We have already disposed of the first contention. In answer to the second it may be said that the statute does not provide that the refusal must be made in violation of regulations of the commission, but that every railroad which shall, "under such regulations as may be prescribed by the commission refuse," etc. It seems that the intention was to prescribe

the penalty for the refusal, but to make the operation of the law subject to regulations which the commission might adopt. The word "under" may mean simply "subject to," and the language was probably intended to make the rule operative without regulations, but to subject its operation to such regulations when made. Under this view, if no regulations were ever adopted, the penalty could accrue for a refusal wherever the law required an acceptance; but if there were such regulations, the question as to whether or not there was such a refusal as to incur the penalty would be determined from a consideration of them as well as of the statute. We are inclined to think that this is the proper view to take of the provision. But the commission had adopted a regulation which fixed the rate at which the property should be carried, leaving the duty to accept and carry to be determined by the law. This being the only regulation, and the duty being to accept the cotton in accordance with it and with the law, there was a refusal to receive under it as well as under the law. It was not necessary for the commission to impose upon the railroad company the duty to receive the freight. The law does that. The fixing of the rate makes the regulation as complete as if one were adopted defining the duty. The defendant, therefore, in our opinion, incurred the penalty if it refused to receive the cotton, as the court below found, except upon condition which it had not the right to impose. But the penalty is fixed at not less than $125 nor more than $500, and the amount to be imposed should be graded according to circumstances. This function we think properly belongs to the judge or jury trying the case, and not to this court. As to the penalties claimed under the other subdivision of section 15, the evidence being, in some important particulars conflicting and indefinite, we cannot well determine; and as the case is to be reversed, we think it proper to remand the actions for penalties (as they are distinct and separate from the action for damages) for retrial.

The judgment of the District Court is reversed, and judgment rendered in favor of plaintiffs for excessive freight paid $2698.68, and for the expense in rehauling cotton $227.05, with six per cent interest on both sums from October 31, 1894, and that plaintiffs take nothing on their claim for exemplary damages, and that the actions for penalties under section 15 of the statute referred to be remanded for new trial.

*Reversed and rendered in part and remanded in part.*